UNITED STATES of America,
Plaintiff–Appellee,

v.

Chris PETTI, aka Chris George Poulos,
Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellant,

v.

Chris PETTI, aka Chris George
Poulos, Defendant–Appellee.

Nos. 91–50123, 91–50229.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 5, 1992.

Decided Aug. 10, 1992.

1442

Oscar B. Goodman, Goodman & Chesnoff, Las Vegas, Nev., for defendant-appellant-cross-appellee.

Carol C. Lam, Asst. U.S. Atty., San Diego, Cal., for plaintiff-appellee-cross-appellant.

Before BROWNING and FARRIS, Circuit Judges, CAULFIELD, District Judge.*

JAMES R. BROWNING, Circuit Judge.

## I. Facts

In July 1987, the FBI applied for and received judicial authorization for wiretap surveillance of appellant-cross-appellee Petti and several others suspected of engaging in a fraudulent scheme to gain control of a gambling enterprise on the Rincon Indian Reservation in San Diego, California. During the investigation, Petti's supposed friend, Benjamin, a government informant, introduced Petti to Agent Ahearn, an undercover investigator posing as a representative of Colombian cocaine dealers.

By the end of 1988, the focus of the investigation had shifted from the scheme

---

* Honorable Barbara A. Caulfield, United States District Judge for the Northern District of California, sitting by designation.

to gain control of the gambling operation to a money laundering scheme involving a number of the same players, including Petti and his codefendant Silberman. Petti introduced Agent Ahearn to Silberman in November 1988. Agent Ahearn was to "invest" $100,000 in a "smurfing" scheme.[1] At one point, Agent Ahearn asked Petti to "check out" one of the people involved in the scheme, and Petti did so, assuring Agent Ahearn the person was "okay."

In February 1989, Agent Ahearn and Silberman met to discuss a second deal. Agent Ahearn gave Silberman $200,000 in cash to be "laundered," and was given coupon bonds in exchange. Their value was less than promised, but Silberman and Petti assured Agent Ahearn that Petti would "take care of it." Ultimately, Silberman and Petti were arrested after Agent Ahearn and Silberman met to discuss still another money laundering deal.

Silberman's and Petti's trials were severed. Silberman, tried first, was convicted only of structuring financial transactions to avoid currency reporting requirements; the jury hung on the remaining counts. Silberman subsequently pled guilty to conspiring to evade reporting requirements and was sentenced to 46 months.

Before Petti was tried, the court denied his motion to suppress evidence of a number of wiretapped and taped conversations demonstrating his connection to Silberman and Agent Ahearn. That evidence was introduced at trial and Petti was convicted of conspiring to launder money and evade currency reporting requirements, evading currency reporting requirements, and filing false currency transaction reports.

Petti's base offense level under the federal sentencing guidelines was 20. It was raised two levels because the amount involved was more than $200,000 and three more because Petti knew the money came from narcotics activity. It was reduced four levels for Petti's minimal participation and two more for acceptance of responsibil-

ity. The resulting sentencing range was 37 to 46 months. The court departed downward and sentenced Petti to 30 months.

Petti appeals from the denial of his suppression motion, claiming the statute authorizing the wiretap surveillance violates the Fourth Amendment, and, if the statute is constitutional, the government did not meet its requirements. He also maintains there was insufficient evidence to support his conviction. The government cross-appeals, contending the court erred in granting the four-level reduction for minimal participation and in departing downward.

## II. Constitutionality of Roving Wiretap Surveillance

■ Twenty-five years ago, the Supreme Court determined the Fourth Amendment governs wiretap surveillance. See *Berger v. New York*, 388 U.S. 41, 50–53, 87 S.Ct. 1873, 1879–80, 18 L.Ed.2d 1040 (1967); *Katz v. United States*, 389 U.S. 347, 352–53, 88 S.Ct. 507, 511–12, 19 L.Ed.2d 576 (1967). The Court made clear that if certain conditions were met, wiretapping authorized by warrant would pass constitutional muster. *Berger*, 388 U.S. at 54–60, 87 S.Ct. at 1881–84; *Katz*, 389 U.S. at 354–56, 88 S.Ct. at 512–14.

Congress codified the requirements of *Berger* and *Katz* in Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520 ("Title III"). See S.Rep. No. 1097, 90th Cong., 2d Sess. 66 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2161–63. Every circuit to address the issue, including our own, has upheld Title III against a challenge of facial unconstitutionality. See *United States v. Turner*, 528 F.2d 143, 158–59 (9th Cir.1975) (citing cases).

Title III was amended and retitled by the Electronic Communications Privacy Act of 1986, 18 U.S.C. §§ 2510–2521 ("Title I"). For purposes of Petti's appeal, we are concerned with only one of the changes Title I made: the addition of a provision, relied

---

1. "Smurfs" are television cartoon characters who move rapidly from place to place. "Smurfing" schemes are those in which participants carry out multiple transactions in various banks to avoid filing currency transaction reports. See *United States v. Morales–Vasquez*, 919 F.2d 258, 261 (5th Cir.1990).

upon by the government in this case, permitting wiretap interception of an identified suspect's conversations over telephone facilities that are not and cannot be identified by address in the warrant. *See* 18 U.S.C. § 2518(11).[2] Petti maintains the absence of a description of the specific telephone facilities from which the suspect's conversations are to be intercepted violates the Fourth Amendment requirement that no warrant shall issue except one "particularly describing the place to be searched."

█ The Supreme Court has explained:

The manifest purpose of [the] particularity requirement was to prevent general searches. By limiting the authorization to search to the specific areas and things for which there is probable cause to search, the requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit.

*Maryland v. Garrison,* 480 U.S. 79, 84, 107 S.Ct. 1013, 1016, 94 L.Ed.2d 72 (1987). And as we held in *United States v. Turner,*

the "test for determining the sufficiency of the warrant description is 'whether the place to be searched is described with sufficient particularity to enable the executing officer to locate and identify the premises with reasonable effort, and whether there is any reasonable probabil-

ity that another premise might be mistakenly searched.' "

770 F.2d 1508, 1510 (9th Cir.1985) (citations omitted). To satisfy the particularity requirement, then, the description of the place to be searched must not be so broad as to allow the search of places for which probable cause to search has not been demonstrated, or so vague that an executing officer might mistakenly search a place for which authorization was not granted.

If the description of the place to be searched avoids these dangers, it may comply with the particularity requirement even though it does not specify the physical location of the place to be surveilled. Thus, in *United States v. Karo,* 468 U.S. 705, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984), the Court rejected the argument that because it was impossible for police officers to specify in advance the place or places a beeper placed in a mobile object would invade, they should be able to monitor the beeper without first obtaining a warrant. The Court noted that the officers could satisfy the purposes of the particularity requirement by providing other information:

The Government contends that it would be impossible to describe the "place" to be searched, because the location of the place is precisely what is sought to be discovered through the search. However true that may be, it will still be possible to describe the object into which the

---

2. The statute provides that an application for an order authorizing wiretap surveillance usually must include a description of the place or facilities from which communications are to be intercepted, 18 U.S.C. § 2518(1)(b)(ii), and the issuing judge must determine there is probable cause to believe the facilities in question are being or will be used in connection with the commission of an offense, or are leased to, listed in the name of, or commonly used by the suspect, 18 U.S.C. § 2518(3)(d). The 1986 amendment added the provision that these requirements need not be met if certain conditions are satisfied:

The requirements of subsections (1)(b)(ii) and (3)(d) of this section relating to the specification of the facilities from which, or the place where, the communication is to be intercepted do not apply if—

. . . . .

(b) in the case of an application with respect to a wire or electronic communication—

(i) the application is by a Federal investigative or law enforcement officer and is approved by the Attorney General, the Deputy Attorney General, the Associate Attorney General, an Assistant Attorney General, or an acting Assistant Attorney General;

(ii) the application identifies the person believed to be committing the offense and whose communications are to be intercepted and the applicant makes a showing of a purpose, on the part of that person, to thwart interception by changing facilities; and

(iii) the judge finds that such purpose has been adequately shown.

18 U.S.C. § 2518(11)(b).

beeper is to be placed, the circumstances that led agents to wish to install the beeper, and the length of time for which beeper surveillance is requested. In our view, this information will suffice to permit issuance of a warrant authorizing beeper installation and surveillance.

*Id.* at 718, 104 S.Ct. at 3305 (citation omitted).

The conditions imposed on "roving" wiretap surveillance by 18 U.S.C. § 2518(11)(b)(ii) satisfy the purposes of the particularity requirement. The statute does not permit a "wide-ranging exploratory search," and there is virtually no possibility of abuse or mistake. Only telephone facilities actually used by an identified speaker[3] may be subjected to surveillance, and the government must use standard minimization procedures to ensure that only conversations relating to a crime in which the speaker is a suspected participant are intercepted. *See* 18 U.S.C. § 2518(5). Further, the statute excuses failure to identify the particular telephone facilities to be surveilled only if the government establishes to the court's satisfaction that it is impossible to specify the facilities because it is the suspect's purpose to thwart interception by changing them. *See* 18 U.S.C. § 2518(11)(b)(ii).

Because the conditions imposed by the roving wiretap provision satisfy the purposes of the particularity requirement, and

because we have determined previously that the many safeguards mandated by the statute for both roving and fixed interceptions satisfy the Fourth Amendment requirement that "no greater invasion of privacy [occur] than [is] necessary" to meet "the legitimate needs of law enforcement," *Katz*, 389 U.S. at 355–56, 88 S.Ct. at 513–14 (internal quotation marks and citations omitted),[4] the district court correctly found the provision permitting roving wiretaps to be constitutional.[5]

### III. Necessity for Surveillance

■ Petti contends the government's application for wiretap authority did not comply with the requirement that such an application attest to the necessity of the wiretap by including "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous[.]" 18 U.S.C. § 2518(1)(c). "We review de novo whether a full and complete statement of the facts was submitted in compliance with 18 U.S.C. § 2518(1)(c)," *United States v. Brone*, 792 F.2d 1504, 1506 (9th Cir.1986), and our review of the record convinces us that unlike the affidavits in the cases cited by Petti,[6] the affidavits submitted by the government in this case adequately explained why alternative investigative techniques were insufficient.[7]

3. In contrast, in an application for fixed wiretap surveillance the anticipated speaker need be identified only if known. 18 U.S.C. § 2518(1)(b)(iv); *see also United States v. Donovan*, 429 U.S. 413, 427 n. 15, 97 S.Ct. 658, 668 n. 15, 50 L.Ed.2d 652 (1977) ("It is not a constitutional requirement that all those likely to be overheard engaging in incriminating conversations be named.").

4. These safeguards are discussed in the context of the roving interception provision in the opinion of the district court in this case, *United States v. Silberman*, 732 F.Supp. 1057, 1061–63 (S.D.Cal.1990), and in *United States v. Ferrara*, 771 F.Supp. 1266, 1288–90 (D.Mass.1991).

5. *See generally* Clifford S. Fishman, *Interception of Communications in Exigent Circumstances: The Fourth Amendment, Federal Legislation, and the United States Department of Justice*, 22 Ga. L.Rev. 1, 65–69, 86 (1987) (concluding roving surveillance provision is constitutional); Michael Goldsmith, *Eavesdropping Reform: The*

*Legality of Roving Surveillance*, 1987 U.Ill. L.Rev. 401, 415–425 (same).

6. *United States v. Carneiro*, 861 F.2d 1171, 1180–83 (9th Cir.1988) (material facts withheld); *United States v. Kalustian*, 529 F.2d 585, 589–90 (9th Cir.1975) (affidavit merely speculative).

7. The affidavits explained that agents had obtained and analyzed telephone toll records and "pen registers" recording the numbers dialed from a particular telephone, but this data did not provide the kind of information necessary to establish the offenses suspected; that the agents had tried to "wire" Benjamin to record his conversations with Petti but failed because of steps Petti took to avoid surveillance; and that they had tried to obtain the necessary information from Benjamin's oral reports of these conversations, but Benjamin was not privy to many of the crucial conversations and in any event, given his criminal record, would not be a

Petti further contends the government's showing was directed only to the necessity for wiretap surveillance of the scheme to obtain control of the Rincon Reservation gambling enterprise, and not to the necessity for wiretap surveillance of the money laundering scheme. However, the facts that justified wiretapping the phones Petti used in an effort to obtain control of the gambling enterprise justified tapping the same phones when they were used to further the scheme to launder drug money.

In a related argument, Petti maintains the government did not notify the issuing judge prior to the wiretapping that the wiretaps would be used to intercept communications regarding the money laundering scheme. Title 18 U.S.C. § 2517(5) allows the evidentiary use of intercepted wire communications regarding offenses other than those specified in the authorizing order so long as a judge determines, on application *subsequent* to the interception, that they were otherwise intercepted in accordance with Title I.[8] The government complied with the statute. The issuing judge did not abuse his discretion in determining wiretaps were necessary. *See Brone*, 792 F.2d at 1506.

### IV. Sufficiency of Evidence

■ Petti claims there was insufficient evidence to convict him of the substantive offenses of money laundering and evasion of currency reporting requirements.

A defendant may be found guilty of foreseeable substantive offenses committed by coconspirators in furtherance of the conspiracy. *See, e.g., United States v. Aichele*, 941 F.2d 761, 764 (9th Cir.1991). The government presented evidence that Petti knew Agent Ahearn wanted to avoid currency reporting requirements, assured Agent Ahearn this would not be a problem, and arranged to have Agent Ahearn meet with Silberman for this purpose, vouching for Silberman's truthfulness. It was at least reasonably foreseeable to Petti that a scheme to launder money and evade currency reporting requirements would be undertaken. The foreseeability of the exact course of action adopted by Silberman and the other scheme participants, a course Petti characterizes as "Byzantine," is immaterial. *See, e.g., United States v. Reed*, 726 F.2d 570, 580 (9th Cir.1984) (defendant who claimed he agreed only to burning a restaurant but did not agree to the use of explosives was properly held guilty of conspiring to destroy property by means of explosives; he "need not have known the precise method employed to be vicariously liable for the acts that resulted in accomplishing the conspiratorial goal" of destroying the restaurant).

### V. Four–Level Reduction for Minimal Participation [9]

■ The government claims the district court clearly erred in granting Petti a four-

---

sufficiently credible trial witness without corroborating evidence.

Petti contends Benjamin's credibility is irrelevant because the government's ultimate ability to prosecute its case successfully may not be considered in determining necessity. He is incorrect. *See, e.g., Brone*, 792 F.2d at 1506 (finding sufficient an affidavit that explained why normal investigative techniques would not "allow the government to develop an effective case").

8. Section 2517(5) provides in pertinent part:
When an ... officer, while engaged in intercepting wire ... communications in the manner authorized herein, intercepts wire ... communications relating to offenses other than those specified in the order of authorization or approval, the contents thereof, and any evidence derived therefrom, .... may be [disclosed at trial] when authorized or approved by a judge of competent jurisdiction

where such judge finds on subsequent application that the contents were otherwise intercepted in accordance with the provisions of this chapter. Such application shall be made as soon as practicable.
*18 U.S.C. § 2517(5).*

9. In his opening brief, Petti contended the government's cross-appeal had to be dismissed because the appellate record did not reflect compliance with 18 U.S.C. § 3742(b), which provides the government may not prosecute an appeal of a sentence "without the personal approval of the Attorney General, the Solicitor General, or a deputy solicitor general designated by the Solicitor General."

With its reply brief the government submitted proof that the United States Attorney had in fact received authorization from the Solicitor General to appeal Petti's sentence.

The statute does not require that proof of approval be included in the appellate record.

level reduction in his offense level under U.S.S.G. § 3B1.2(a), *see United States v. Sanchez–Lopez,* 879 F.2d 541, 557 (9th Cir. 1989), based on the court's finding that Petti's participation in the criminal conduct at issue was minimal in comparison to that of the others involved. For purposes of section 3B1.2, the government contends, the defendant's conduct is to be assessed not against that of his co-participants in the particular criminal activity but rather against that of a hypothetical "average" participant in the type of crime involved.

The government asserts the question of the appropriate comparison is open in this circuit, citing *United States v. Andrus,* 925 F.2d 335, 338 (9th Cir.1991). However, *Andrus* involved subsection (b) of section 3B1.2, which provides a two-level reduction in offense level for "minor"—not "minimal"—participation. The application note for subsection (a), the subsection applicable here, specifically states that subsection (a) "applies to a defendant who plays a minimal role in concerted activity. It is intended to cover defendants who are plainly among the least culpable *of those involved in the conduct of a group."* U.S.S.G. § 3B1.2, comment. (n.1) (emphasis added).

We recently held that even when subsection (a)'s four-level reduction in offense level is available, a downward departure from the sentencing guidelines' sentencing range may also be warranted if "the defendant's role in criminal activity is so remote that relative blamelessness 'is present to a degree *substantially in excess of that which ordinarily is involved in the offense.'"* *United States v. Valdez–Gonzalez,* 957 F.2d 643, 649 (9th Cir.1992) (citation omitted and emphasis added).

Together, application note 1 and our ruling in *Valdez–Gonzalez* strongly suggest that while comparison to the conduct of a hypothetical average participant may be appropriate in determining whether a downward departure from the sentencing range is warranted, the relevant comparison in determining whether a four-level adjustment in offense level is appropriate is to the conduct of co-participants in the case at hand—the comparison the district court made in this case.

■ The government also mistakenly relies on *Andrus* 's holding that "merely being less culpable than one's co-participants does not automatically result in minor [participant] status." 925 F.2d at 338. The district court did not conclude Petti was automatically entitled to a reduction simply because he was less culpable than Silberman. Rather, the court thought Petti "far, far less culpable;" that is, the court properly found Petti's participation minimal in comparison to that of his coparticipant's.

■ The government further argues Petti does not qualify for the reduction because "he understood the full scope of the conspiracy and willingly participated in it." The government relies on application note 1, which states "the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as minimal participant." U.S.S.G. § 3B1.2, comment. (n.1). The government suggests the converse necessarily follows. But while a lack of knowledge could support a finding of minimal participation, something more than a complete absence of understanding does not necessarily preclude such a finding. Although the government lists "critical functions" Petti performed as a member of the conspiracy, it concedes that "he was not involved in the actual 'smurfing' of the money into the banks, or privy to all the mechanics of the laundering operation," and that his role was "subordinate" to Silberman's. The government has pointed to no evidence indicating the district court clearly erred in

---

See *United States v. Hall,* 943 F.2d 39, 41 (11th Cir.1991). Only the Sixth Circuit requires that proof of approval be filed no later than the government's opening brief. *See United States v. Smith,* 910 F.2d 326, 328 (6th Cir.1990). However, the Sixth Circuit has also decided belated submission of proof of approval does

not deprive the court of jurisdiction. *See United States v. Rutana,* 932 F.2d 1155, 1158 n. 5 (6th Cir.1991). Thus, even were we to adopt the Sixth Circuit rule, the late submission of proof of authorization would not require dismissal of the government's appeal.

concluding Petti's role was minimal in comparison to that of his co-participants.

### VI. Downward Departure

 The government maintains the district court erred in departing downward from the sentencing range. The court reasoned a downward departure was warranted to eliminate the disparity between Silberman's 46 month sentence and the 37 to 46 month sentencing range applicable to the less culpable Petti.

 A district court may not depart downward to correct sentencing disparities between codefendants. *United States v. Mejia,* 953 F.2d 461, 467–68 (9th Cir.1991). Further, the district court did not find the reason for departure—lesser culpability—was not adequately taken into consideration by the guidelines. *Cf. United States v. Lira–Barraza,* 941 F.2d 745, 746 (9th Cir.1991) (en banc) (departure is not appropriate unless the circumstances of the case were not adequately taken into consideration). The guidelines do provide for a reduction in offense level when a defendant is less culpable than his co-participants and Petti had already received such a reduction.

We vacate the sentence and remand for resentencing within the 37 to 46 month range.

AFFIRMED in part; VACATED and REMANDED in part.[10]

---

**10.** Cause has been shown for Petti's counsel's delay in filing his opening brief and we decline to impose sanctions.