**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Maurillo ROJAS–MILLAN,**
**Defendant–Appellant.**

**No. 98–10518.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 12, 2000

Filed Dec. 8, 2000

---

Franny Forsman, Federal Public Defender, and Michael K. Powell, Assistant Federal Public Defender, Reno, Nevada, for defendant-appellant Maurillo Rojas–Millan.

Kathryn E. Landreth, United States Attorney, and Daniel G. Bogden, Assistant United States Attorney, Reno, Nevada, for appellee the United States of America.

Before: GRABER, FISHER and BERZON, Circuit Judges.

BERZON, Circuit Judge:

Maurillo Rojas–Millan appeals from his conviction and sentencing for (1) possession of methamphetamine with intent to distribute, 21 U.S.C. § 841(a)(1); (2) conspiracy to possess with intent to distribute, 21 U.S.C. § 846; and (3) interstate travel in aid of racketeering, 18 U.S.C. § 1952(a)(3). Although we find no basis for overturning his conviction, we do find that the district court mistakenly concluded that it did not have discretion to grant a downward adjustment for being a minor participant, and that it is not certain that the district court exercised its discretion regarding whether a downward departure for aberrant behavior was appropriate. Consequently, we vacate the sentence and remand the case to the district court.

## I. Background

On March 7, 1998, at about five in the evening, a Nevada Highway Patrol (NHP) Trooper, James Marshall, spotted Rojas–Millan and a companion, Jorge Adame–Farias, driving east along Interstate 80 in Reno. Marshall, understandably, spends a lot of time looking at license plates, and he noticed something strange about the tags on Rojas–Millan's 1989 Nissan Sentra: they began with the numeral "4." This was the first time Marshall had seen white-series California tags that did not begin with either a "1," "2," or "3," and he might have passed them off as brand-new plates except that he also noticed they had 1998 registration stickers. California issued 1998 stickers in 1997; if the plates were in fact new, Marshall thought they would have had 1999 stickers. He therefore suspected that the plates might be fictitious—that either the car, the plates, or the registration stickers might have been stolen—and so he called his dispatch unit to run a check on the plate number.

NHP dispatch ran a check but came up with "no match," indicating that the number was not listed as a valid California license plate. Marshall double-checked and repeated the number, and again the dispatch unit told him "no match." These responses heightened Marshall's suspicion that the car might be stolen, or at least that the tags and registration might be fictitious. Driving a vehicle with fictitious plates is a violation of Nevada law, Nev. Rev.Stat. § 482.545 (1999), and so Marshall initiated a traffic stop.[1]

---

1. Marshall's cruiser was equipped with an Eye–Witness on-board video system that he activated when he turned on his emergency lights. It recorded all the events that followed. The tape was admitted into evidence and presented at trial.

Rojas–Millan promptly pulled off the interstate and stopped. As Marshall approached the vehicle, he noted an unusually strong odor of perfume emanating from its interior, which, based on his training, suggested that the driver might be masking the smell of illegal drugs. Marshall proceeded to question Rojas–Millan about his registration, and Rojas–Millan presented Marshall with both a seemingly valid Oregon driver's license and a California vehicle registration in his name. Marshall next asked Adame–Farias for identification, and Adame–Farias presented his California identification card.

Marshall again called NHP dispatch to verify information on the vehicle and its two occupants. While reviewing the registration documents and awaiting word from dispatch, Marshall questioned Rojas–Millan and Adame–Farias separately about their travel plans. Rojas–Millan explained that he had come to Reno to meet a friend, although he did not know where the friend was to be found, and that he intended to return to Stockton, California, that evening. Adame–Farias claimed that he was a mechanic and that he had come to fix someone's car, although he did not know who the owner was, where the car was located, or what kind of car it was.

Dispatch reported that its check of record indices for Rojas–Millan's name turned up nothing, but Marshall continued his investigation. He again asked Rojas–Millan where he was going, whether there were guns, alcohol or large sums of cash in the car, and finally, whether he had any drugs. He then asked for permission to search the vehicle. Rojas–Millan agreed and signed a form written in Spanish certifying his consent.

During the search, Marshall saw that a decorative panel in the rear right-hand side of the car had been pulled back and disfigured. When he pulled it back further he found two packages of methamphetamine. Eventually, investigators found a total of ten packages containing four kilograms of methamphetamine in the car. After his arrest, Rojas–Millan explained that he had received the drugs in Los Angeles and was to deliver them to an unknown individual in the parking lot of the Eldorado Hotel in Reno.

A jury convicted Rojas–Millan of possession with intent to distribute and related offenses, and the district court sentenced him to 188 months in prison. Rojas–Millan filed a timely appeal challenging the conviction and sentence.

## II. Rojas–Millan's Conviction

Rojas–Millan attacks his conviction on the ground that, for several reasons, the district court should have suppressed evidence gathered at the traffic stop. Rojas–Millan contends: (1) that Marshall improperly stopped his vehicle without probable cause or reasonable suspicion; (2) that Marshall improperly detained him without adequate reasons; and (3) that Marshall improperly searched his car without his consent. We review de novo the district court's ultimate finding of reasonable suspicion or probable cause supporting a search or seizure, but review underlying factual findings only for clear error. *United States v. Lopez–Soto*, 205 F.3d 1101, 1103 (9th Cir.2000). Determinations that consent to a search was voluntary are reviewed for clear error. *See United States v. Cormier*, 220 F.3d 1103, 1112 (9th Cir.2000) (noting that "consent is a question of fact, and its resolution depends upon the totality of the circumstances").

### A. The Stop

Traffic stops are seizures under the Fourth Amendment, so officers must have at least a reasonable suspicion of criminal misconduct before detaining a driver. *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). Reasonable suspicion, as this court recently affirmed, "is formed by specific, articulable facts which, together with objective and reasonable inferences, form the basis

for suspecting that the particular person detained is engaged in criminal activity." *Lopez–Soto,* 205 F.3d at 1105 (citations and internal quotation marks omitted). Further, although "[a]n officer is entitled to rely on his training and experience in drawing inferences from the facts he observes, ... those inferences must also be grounded in objective facts and be capable of rational explanation." *Id.* (citations and internal quotation marks omitted).

■■■ Marshall's suspicion that Rojas–Millan's plates might be fictitious became a reasonable basis for a traffic stop once he ran two checks on the number, both of which came up "no match." A Nevada statute prohibits "any person" from displaying "any certificate of registration, license plate, certificate of ownership or other document of title knowing it to be fictitious or to have been canceled, revoked, suspended or altered." Nev.Rev. Stat. § 482.545(2) (1999). Although Rojas–Millan maintains that § 482.545(2) applies only to Nevada residents, there is nothing in the language of the statute to so indicate. Moreover, while the previous subsection, Nev.Rev.Stat. § 482.545(1) (1999), does contain through cross-reference an exemption for non-residents from the requirement that cars bear Nevada plates, that exemption, Nev.Rev.Stat. § 483.382 (1999), provides in subsection (1) that nonresidents "may operate ... [a] vehicle within this state without its registration in this state," but only if the vehicle "has been registered for the current year in the state, country, or other place of which the owner is a resident and ... at *all times when operated in this state has displayed upon it the registration license plate issued for the vehicle in the place of residence of the owner*" (emphasis added). A fictitious license plate does not meet this requirement, so a person driving with a fictitious license plate from another state is not exempt from Nevada's vehicle registration requirement. Thus, Marshall's reasonable suspicion of a violation of Nevada law was "objectively grounded in the governing law," *Lopez–Soto,* 205 F.3d at 1106, and his decision to make the stop was lawful.

Because Marshall correctly understood Nevada law, the circumstances in this case are quite distinct from those in other recent cases in which we held that the officer's suspicion was based on a misunderstanding of the applicable law and therefore not reasonably justified. *See United States v. Twilley,* 222 F.3d 1092, 1096 (9th Cir.2000) (finding no reasonable suspicion to support a traffic stop of an out-of-state vehicle displaying only a rear license plate when the stop was based on the officer's mistaken belief that the state's vehicle code required display of both front and rear license plates); *Lopez–Soto,* 205 F.3d at 1106 (finding no reasonable suspicion to support a traffic stop of a vehicle registered in Baja California with a registration sticker properly affixed to the front windshield when the stop was based on the officer's mistaken belief that Baja California's vehicle code required display of registration stickers on the rear window). Furthermore, Marshall, unlike the officers in *Twilley* and *Lopez–Soto,* had objective reasons to suspect more than just improper registration. Here, based on the "no match" finding from the tag check, he also reasonably suspected the car might be stolen, and thus he had a reasonable suspicion warranting further investigation. Consequently, we conclude that Marshall's decision to stop the car was lawful.

### B. The Detention

■■ Rojas–Millan next argues that, even if the stop was lawful, Marshall improperly detained him after confirming that his registration was in order, so the district court should have suppressed evidence obtained as a result. The Supreme Court established the basic requirements for detaining a driver after a traffic stop in its decisions in *United States v. Brignoni–Ponce,* 422 U.S. 873, 881, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), holding that any questioning must relate to the purpose of the

stop, and in *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), holding that the detention must be temporary and unintrusive. We conclude that the evidence here satisfied these requirements.

As noted earlier, the objective facts observed by Marshall raised concerns about more than just technical registration violations. He suspected that the car might be stolen and undertook his initial questioning of the defendants for that reason. The answers offered by Rojas–Millan and Adame–Farias to Marshall's questions while he awaited further information from dispatch, however, were oddly vague. Rojas–Millan, for example, claimed that he had come to Reno to meet a friend, though he did not know where or how to get in touch with him. He said that after meeting the friend, he planned to return that same evening to Stockton, California, nearly 200 miles away—a considerable distance for such a short visit, which, to Marshall, suggested a possible "drug delivery, or some type of delivery of something illegal." Adame–Farias claimed that he was a mechanic and that he had come to Reno to fix someone's car, though he did not know whose car or where it was located.

Marshall's suspicions about possible misconduct were further deepened by the unusually strong odor of perfume emanating from inside Rojas–Millan's car. Based on his training, Marshall suspected that the perfume was intended to mask the smell of illegal drugs.

This combination of suspicious factors justified the short continued detention of the vehicle between the time the record check was completed and the time consent to search was requested. *See United States v. Baron*, 94 F.3d 1312, 1319 (9th Cir.1996) (holding that the totality of factors must be considered when determining whether reasonable justification for continued detention exists); *United States v. Perez*, 37 F.3d 510, 514 (9th Cir.1994) (same). The additional questioning that occurred during that period was also per-missible, because once questioning begins, "[a]n officer may broaden his or her line of questioning if he or she notices additional suspicious factors," so long as those factors are "particularized" and "objective." *Id.* at 513.

In sum, although Rojas–Millan presented registration papers in his name, Marshall's continued detention of Rojas–Millan was justified, because his continued suspicion that illegal activity was afoot remained reasonable.

## C. The Search

■ Rojas–Millan last contends that he did not give adequate consent to Marshall's search of the vehicle. The district court considered testimony on this question, however, and determined that consent was given. We find no clear error in its determination.

Although Rojas–Millan signed a consent form, he claims that the Spanish translation of the form was misleading. Specifically, he objects to the use of the verb "registren," which, according to the testimony of a court translator, could mean either "to search" or "to register." This argument collapses, however, because the translator further testified that, in the context of the form, "registren" meant "to search." The district court did not commit clear error by relying on this later testimony and concluding that the language of the form did not mislead Rojas–Millan. Consequently, we affirm the determination that Rojas–Millan voluntarily consented to the search.

Rojas–Millan's conviction is therefore affirmed.

## III. Rojas–Millan's Sentence

We now turn to the various challenges that Rojas–Millan raises to the district court's 188 month sentence. First, he contends that the district court improperly enhanced his sentence based on allegations of obstruction of justice. Second, he claims that the district court did not prop-

erly recognize his relatively minor role in the alleged criminal activity. Finally, he argues that the district court should have awarded a downward departure based on aberrant behavior.

### A. Obstruction of Justice

Rojas–Millan argues that the district court's findings that he obstructed justice were insufficient and, therefore, that it erred in enhancing his sentence for that reason. We disagree, however, and conclude that the findings are sufficient on the only point to which Rojas–Millan even possibly raised an adequate objection.

 The district court adopted the findings of the presentence report ("PSR"), which determined that Rojas–Millan had perjured himself and lied in his testimony in the trial of Adame–Farias. In so doing, the PSR found that he had "willfully impeded or obstructed, or attempted to impede or obstruct, the administration of justice." Following the PSR's recommendation, the district court imposed a two-point upward adjustment under U.S.S.G. § 3C1.1 for obstruction of justice.

In *United States v. Dunnigan*, the Supreme Court held that, "*if* a defendant objects to a sentence enhancement resulting from her trial testimony, a district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same...." 507 U.S. 87, 95, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993) (emphasis added); *see also United States v. Monzon–Valenzuela*, 186 F.3d 1181, 1183–84 (9th Cir.1999). Rojas–Millan, however, objected, in writing and orally, to the aberrant behavior and minor participant portions of the PSR, but *not* to the obstruction of justice portion.

Only *after* the district court ruled on the basic offense level, including the obstruc-

tion of justice enhancement, reserving only the two issues as to which Rojas–Millan had raised objections to the PSR, was there a colloquy, instigated by the government, concerning the obstruction of justice enhancement. Rojas–Millan's counsel at that point very briefly stated "just for purposes of the record" that "the obstruction points are not material by any means," to which the district court responded: "[I]n Mr. Adame–Farias' trial the whole intent of the testimony of Mr. Rojas–Millan was to demonstrate that Mr. Adame–Farias was an absolute dupe who knew nothing of what was going on, and that plainly gets us into the obstruction of justice aspect." This response sufficiently meets the obligation to find materiality, because it plainly indicates that Rojas–Millan's testimony went to the heart of the case against Adame–Farias: his knowledge that drugs were being transported in the car.[2]

Assuming that Rojas–Millan's after-the-fact submission was a sufficient objection—which we do not decide—it was an objection explicitly directed only to the materiality aspect of perjury, not to the falsity or willfulness criteria. *See Dunnigan*, 507 U.S. at 94, 113 S.Ct. 1111 (holding that, for an obstruction of justice adjustment for perjury under § 3C1.1, the district court must find the testimony was false, material, and willful); *United States v. Shannon*, 137 F.3d 1112, 1119 (9th Cir. 1998) (same). The district court's finding of materiality was sufficient to meet the court's obligation under *Dunnigan* with regard to the only objection raised against the obstruction of justice enhancement.

We therefore reject Rojas–Millan's challenge to the district court's upward adjustment for obstruction of justice.

### B. Minor Participant

 Rojas–Millan next contends that he was a minor participant in the

---

2. The district court judge in Rojas–Millan's case also presided in Adame–Farias' case, so his finding of materiality was based on his own observation of Adame–Farias' trial.

criminal scheme and that the district court should have granted him a mitigating role adjustment under § 3B1.2 of the Guidelines. We review the district court's interpretation of the Guidelines de novo, *United States v. Merino*, 190 F.3d 956, 958 (9th Cir.1999); *United States v. Hatley*, 15 F.3d 856, 859–60 (9th Cir.1994), and its application of those Guidelines to a particular case for abuse of discretion, *United States v. Frega*, 179 F.3d 793, 811 n. 22 (9th Cir.1999). The district court's factual findings underlying sentencing decisions must be supported by a preponderance of the evidence. *Id.* We review those findings for clear error. *Hatley*, 15 F.3d at 860.

 Under § 3B1.2(b), a defendant is entitled to a two-point downward adjustment as a "minor" participant if he is deemed "less culpable than most other participants but [his] role could not be described as minimal." U.S.S.G. § 3B1.2, comment (n.3). The district court considered whether to grant Rojas–Millan this reduction and conceded, as did the presentence report, that Rojas–Millan was merely a courier within the overall drug trafficking scheme.[3] Looking only at the two charged defendants brought before it, however, the district court decided that Rojas–Millan was not "substantially" less culpable than his partner, Adame–Farias, and concluded, therefore, that it *could not* grant the minor participant reduction.

Rojas–Millan contends that the district court's definition of "participant" was too narrow. By limiting its considerations to defendants brought to trial, he asserts, the court did not take into account all the relevant actors in the criminal scheme. Although existing case law has not always been clear on this question, we agree with Rojas–Millan and hold that the district court should have evaluated his role relative to all participants in the criminal scheme for which he was charged.

In reaching this conclusion, we begin with our decision in *United States v. Webster*, 996 F.2d 209, 211–12 (9th Cir.1993), in which we also considered whether a drug courier was entitled to a mitigating role adjustment. In *Webster*, the district court determined that, with respect to the charged conduct—possession with intent to distribute—it could not say that the defendant was a minor participant, and it denied the reduction. *Id.* at 212 ("[H]e's charged with the possession with intent to distribute, and he is the possessor and he is going to distribute it, and for me to say that he's a minor participant in that is really, really stretching it."). This court vacated the sentence, concluding that, by looking only at the charged conduct, the scope of the district court's analysis was too narrow. *Id.* Instead, this court looked to the broad wording of § 1B1.3, which defined relevant conduct as "*all* acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant." U.S.S.G. § 1B1.3(a)(1)(A) (emphasis added). Thus, *Webster* concluded, the Guidelines permitted consideration of "all relevant conduct, including collateral conduct beyond the charged offense." This court therefore directed the district court to evaluate the defendant's role relative to the broader drug trafficking conspiracy of which he was part. *Id.; see also Hatley*, 15 F.3d at 859 ("In determining whether a defendant was a minimal or a minor participant in any criminal activity, a district court sentencing a defendant . . . shall consider all conduct within the scope of § 1B1.3 (Relevant Conduct), not just conduct cited in the count of conviction.");

---

**3.** The district court also considered the more generous four-point downward adjustment available under § 3B1.2(a) to "minimal" participants "who are plainly among the least culpable of those involved in the conduct of a group." U.S.S.G. § 3B1.2, comment (n.1). The Guidelines caution courts to grant this reduction only "infrequently," however, and the district court, citing the large amounts of drugs found with Rojas–Millan, declined to award it here. Rojas–Millan does not challenge this determination in his appeal, focusing instead on the denial of the "minor" participant reduction.

*United States v. Demers,* 13 F.3d 1381, 1386 (9th Cir.1994) ("[T]he district court must determine as a factual matter whether [the defendant's] role and culpability in the larger context of his offense were sufficiently minor or minimal compared to other participants in the offense to warrant a § 3B1.2 adjustment.").

In *United States v. Petti,* 973 F.2d 1441, 1446–47 (9th Cir.1992) (concerning the four-point downward adjustment for minimal participants), and *United States v. Benitez,* 34 F.3d 1489, 1497–98 (9th Cir. 1994) (concerning the two-point downward adjustment for minor participants), this court addressed the separate but related question of whether a defendant's conduct "is to be assessed against that of his co-participants in the instant offense, or alternatively, against that of the hypothetical 'average participant' in the type of crime involved." *Id.* at 1498. Although several courts hold the opposite view, the established rule in this circuit is that "[t]he relevant comparison is between the defendant's conduct and that of the other participants in the same offense." *United States v. Klimavicius–Viloria,* 144 F.3d 1249, 1267 (9th Cir.1998) (citing *Benitez,* 34 F.3d at 1498). *But cf. United States v. Ajmal,* 67 F.3d 12, 18 (2d Cir.1995); *United States v. Caruth,* 930 F.2d 811, 815 (10th Cir. 1991); *United States v. Daughtrey,* 874 F.2d 213, 216 (4th Cir.1989). *See generally* Comment, Timothy P. Tobin, *Drug Couriers: A Call for Action by the U.S. Sentencing Commission,* 7 Geo. Mason L. Rev. 1055, 1073–74 (1999) (discussing the differing interpretation of the mitigating role reduction provision).

A question left unanswered in *Petti* and *Benitez* is the one that we must answer today: whether the pool of "co-participants" is limited to the particular *defendants* standing trial in a given case, or whether it includes all actors who participated in a given criminal scheme. Unlike in *Petti* and *Benitez,* in which all the relevant participants appeared before the court, in this case prosecutors have not identified or charged every participant in the charged criminal scheme. Confronted with this situation, the district court adopted a narrow view of "co-participants," equating *participants* with *defendants,* and refused to consider other possible actors in the alleged criminal conspiracy.

This narrow view cannot be squared with the Guidelines' minor participant provision's language or purpose. The Guidelines refer to minor *"participants,"* not to minor *"defendants."* U.S.S.G. § 3B1.2, comment (n.3). Furthermore, a narrow view produces arbitrary results: by ignoring the actions of other participants, it subjects less culpable defendants to longer sentences simply because their more involved co-conspirators managed to escape arrest or were tried separately. We see no reason why the Guidelines would sanction such a regime, and we find confirmation in the language of § 3B1.2 that the intent was not to do so.[4]

We therefore conclude that prosecutors need not identify, arrest, or try together all "participants" in a scheme (and thus transform them into "defendants") in order for the district court to consider their conduct when evaluating a particular defendant's relative role. To the contrary, we read § 3B1.2 as instructing courts to look beyond the individuals brought before it to the overall criminal scheme when determining whether a particular defendant is a minor participant in the criminal scheme.

In deciding whether Rojas–Millan was a minor participant, then, the district court should have considered his culpability rela-

**4.** We are further persuaded by text of § 3B1.1 (Aggravating Role) defining "participant" as "a person who is criminally responsible for the commission of the offense, *but need not have been convicted.*" U.S.S.G. § 3B1.1, comment (n.1) (emphasis added). Although we recognize that this definition is not of general applicability, there is no equivalent definition included with § 3B1.2, and we see no reason to believe that the Guidelines intended courts to treat the term differently in this context.

tive to the involvement of other likely actors, such as the alleged Los Angeles supplier and the Reno distributor. Although the authorities did not identify those parties by name, if the district court found sufficient evidence of their existence and participation in the overall scheme it should have considered that evidence when evaluating Rojas–Millan's relative culpability and deciding whether to grant a minor role adjustment.

The district court made no findings comparing Rojas–Millan's role relative to other participants in the criminal scheme.[5] In the absence of such findings, we cannot say whether he was substantially less culpable than other participants and entitled to a two-point downward adjustment under § 3B1.2(b). We therefore vacate the sentence and remand the case to allow the district court to make this determination under the legal standard that we have announced.

## C. Aberrant Behavior

 Rojas–Millan's final challenge is to the district court's refusal to grant a downward departure for aberrant behavior. We review de novo a district court's conclusion that it lacks authority to depart downward, United States v. Mena, 925 F.2d 354, 355 (9th Cir.1991), but lack jurisdiction to review a discretionary refusal to depart downward, United States v. Morales, 972 F.2d 1007, 1011 (9th Cir.1992).

The critical question, then, is whether the district court here, in denying the downward departure, concluded that it lacked authority to depart downward, or instead exercised its discretion and declined to do so.

In rejecting the request for a downward departure for aberrant behavior, the district judge, after hearing arguments from both sides concerning whether a downward departure for aberrant behavior was appropriate,[6] expressed frustration with the vagueness of the aberrant behavior standard, noting that "[a]ll you get on page eight of the guidelines is a single sentence that talks about a single act of aberrant behavior that may justify probation at higher offense levels. I envy other judges who have been able to assemble some kind of history that allows them to make some sense out of this." The district judge then ruminated generally that, in Rojas–Millan's case, "the guidelines have failed us. We cannot shape a sentence for Mr. Rojas–Millan as we should be able to" but, with respect to the particular question of downward departure, said only that "I reject the aberrant behavior request for a downward departure." Although this statement may well have been intended as an exercise of discretion declining a downward departure, given the general tenor of the district court's comments we are left with some doubt whether the court in fact recognized its discretion.

---

**5.** The district court did observe that "persons like Mr. Rojas–Millan who are mules, who may be the only participants in the case in which they find themselves as defendants, are plainly very minor participants in whatever that whole collective is that makes these awful drugs and then sends them off into our community and others for distribution." Thus, at least in the context of the drug trade generally, the district court found that Rojas–Millan was a "minor participant." This finding is inadequate, however, to support a "minor participant" reduction under § 3B1.2, for it considers Rojas–Millan's conduct against "the hypothetical 'average participant' in the type of crime involved" and not the conduct of his co-participants in his specific criminal scheme. Benitez, 34 F.3d at 1498.

**6.** The government based its argument that the defendant's behavior was not aberrant primarily on the amount of methamphetamine (four kilograms) found in the car, the fact that Rojas–Millan transported it from California to Nevada, the fact that another defendant was involved, and the "sophistication in hiding the drugs in the vehicle." The defense emphasized, in addition to the first offense factor, that the presentence report stated that Rojas–Millan was only a "mule" with regard to the drug transaction, that there is no evidence that it was Rojas–Millan who figured out how to secrete the drugs behind the car panel, and that travel from Stockton to Reno does not take very long.

If a district court reasonably determines that there are significant factors that the Guidelines do not adequately address, it may exercise its discretion and grant a reasonable downward departure. *See* 18 U.S.C. § 3553(b) (departures for aberrant behavior are for mitigating circumstances "not adequately taken into consideration by the Sentencing Commission"); *United States v. Green*, 105 F.3d 1321, 1323 (9th Cir.1997) (same). There are, in particular, several factors that courts may consider when assessing whether behavior is aberrant. The court may, for example, consider whether the conviction was for a first offense.[7] *United States v. Lam*, 20 F.3d 999, 1003–04 (9th Cir.1994). It may evaluate whether or not the defendant engaged in a significant period of advanced planning or reflection, his motivation for undertaking the unlawful scheme, and whether the action was a one-time event or part of a regular pattern. *See Green*, 105 F.3d at 1322–23; *United States v. Pierson*, 121 F.3d 560, 564–65 (9th Cir.1997) (holding that the defendant was not eligible for an aberrant behavior departure where his "participation in the cocaine distribution scheme required substantial planning and involved hundreds of overt acts spanning a period of at least eight months"); *Morales*, 972 F.2d at 1011. If a district court finds a "convergence," *United States v. Fairless*, 975 F.2d 664, 667 (9th Cir.1992), of these or similar factors demonstrating that a defendant's actions "constitute a single act of truly aberrant behavior," *United States v. Dickey*, 924 F.2d 836, 838 (9th Cir.1991), a downward departure is justified.

Because, after reviewing the record, we are left with some doubt concerning whether the district court in this case exercised its discretion or, instead, determined that it lacked the authority to do so, we decline to rule on this question at this time. Rather, we leave it to the district court on remand to clarify its ruling on the aberrant behavior departure. *See Dickey*, 924 F.2d at 839 (holding that, where it is unclear "from the record whether the district court's ruling on this issue was an exercise of its discretion or a legal ruling," remand for clarification is preferable).

## IV. Conclusion

For the foregoing reasons, we affirm Rojas–Millan's conviction but vacate the district court's sentence.[8] The case is hereby remanded for proceedings consistent with this decision.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED.

GRABER, Circuit Judge, concurring in part and dissenting in part:

I concur in the majority's opinion except with respect to Part III(C), from which I respectfully dissent. In my view the district court clearly exercised its discretion to refuse to depart downward on the basis of "aberrant behavior." That being so, we lack jurisdiction to review the court's decision. *United States v. Morales*, 972 F.2d 1007, 1011 (9th Cir.1992).

The district judge was saying, in effect, "I hate these guidelines, especially this

---

7. The absence of a criminal record does not, standing alone, suggest that behavior was aberrant. *See United States v. Pierson*, 121 F.3d 560, 564 (9th Cir.1997) (noting that criminal history is already taken into account by the Guidelines). This court has, however, held that the fact that an offense is the defendant's first may be a relevant factor in considering whether the offense was "a single act of truly aberrant behavior justifying a downward departure." *United States v. Dickey*, 924 F.2d 836, 838 (9th Cir.1991); *see also Morales*, 972 F.2d at 1011.

8. After argument, Rojas–Millan, appearing pro se rather than through counsel, asserted that under the Supreme Court's decision in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), his conviction and sentence were invalid. Any question regarding the applicability of *Apprendi* should be raised, through counsel, before the district court on remand.

part, because they are confusing and I want more discretion"—

But, nevertheless, there we are.

> Now, I would—I reject the aberrant behavior request for a downward departure. . . .

The wording of *rejecting a request* means that the court entertained the request, but said "no." In those circumstances we lack jurisdiction to entertain the appellant's challenge.

Nothing about the sentence "I reject the aberrant behavior request for a downward departure" is ambiguous; nothing about it hints that the court thought that it was unable to entertain the request. The court had asked the parties for arguments about whether it should depart downward for "aberrant behavior." The parties presented arguments pro and con, but both sides clearly assumed that the court *could* depart downward on that basis if it thought it was justified in doing so.

Finally, and perhaps most importantly, nothing in the court's frustrated musings hints that the court thought that it was without authority to grant the request if it wanted to. Look by contrast at what the court said with respect to the "minor participant" question:

> [A]ll we do have from the standpoint of participants are the two defendants, Mr. Adame–Farias and Mr. Rojas–Millan.

> I leave for the Circuit to decide whether I do have the power to go two levels downward. It doesn't appear . . . that I do.

In summary, the record plainly reflects that the district court knew that it had discretion but decided to reject Rojas–Millan's request for a downward departure because of "aberrant behavior." Accordingly, I dissent from Part III(C).