**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

SEGUNDO MARCIAL DOMINGUEZ-
CAICEDO,
*Defendant-Appellant*.

No. 19-50268

D.C. No.
3:18-cr-00421-
BEN-2

---

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

VICTOR GASPAR CHICHANDE,
*Defendant-Appellant*.

No. 19-50271

D.C. No.
3:18-cr-00421-
BEN-3

---

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

ANDRIAN ANDRES CORTEZ-
QUINONEZ, AKA Andrian Andres
Quinonez-Cortez,
*Defendant-Appellant*.

No. 19-50274

D.C. No.
3:18-cr-00421-
BEN-1

OPINION

Appeal from the United States District Court
for the Southern District of California
Roger T. Benitez, District Judge, Presiding

Argued and Submitted July 29, 2021
Pasadena, California

Filed July 18, 2022

Before:  MILAN D. SMITH, JR. and KENNETH K. LEE,
Circuit Judges, and EDUARDO C. ROBRENO,[*]
District Judge.

Opinion by Judge Milan D. Smith, Jr.

---

[*] The Honorable Eduardo C. Robreno, United States District Judge
for the Eastern District of Pennsylvania, sitting by designation.

# SUMMARY**

## Criminal Law

The panel affirmed Adrian Andres Cortez-Quinonez's, Segundo Marcial Domingez-Caicedo's, and Victor Gaspar Chichande's convictions for conspiring to distribute cocaine on board a vessel, possession of cocaine with intent to distribute on board a vessel, and aiding and abetting; affirmed Dominguez-Caicedo's and Cortez-Quinonez's sentences; vacated Chichande's sentence; and remanded for Chichande's resentencing.

Coast Guard officers boarded a suspicious panga boat carrying the defendants near the Galapagos Islands after the boat ignored warnings to stop. Officers then detained the defendants, and the Coast Guard transferred them to a series of Coast Guard cutters, eventually transferring them to DEA custody in Long Beach, where a DEA agent had each defendant sign a Rule 5 waiver that allowed them to be transferred to San Diego instead of going before a magistrate judge in Long Beach.

The defendants moved to dismiss the indictment for outrageous government conduct based on their treatment aboard the Coast Guard cutters. In order to secure dismissal of an indictment due to outrageous government conduct, a defendant must show a nexus between the conduct and either securing the indictment or procuring the conviction. The defendants claimed that the nexus between the Government's conduct and securing the indictment is

---

** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

satisfied because if the Coast Guard had chosen to treat the defendants and other detainees humanely, they couldn't have conducted their Pacific operations. The panel wrote that this is not the type of nexus this court generally considers sufficient to establish outrageous government conduct requiring dismissal of an indictment, noting that nearly all police actions are broadly connected to securing indictments. The panel wrote that the Ninth Circuit appears to have assumed without deciding that outrageous government conduct *could* apply to conditions of confinement, so long as there is a nexus between the conduct and securing the indictment or conviction. Because there is no nexus here, the panel did not revisit that conclusion. The defendants argued that even if outrageous government conduct does not require dismissal of the indictment, the district court should have used its supervisory powers to provide the same remedy, asserting that the government should tread lightly in international waters, and the court should not condone mistreatment of foreigners with no connection to the United States. The panel wrote that pursuant to *United States v. Matta-Ballesteros*, 71 F.3d 754 (9th Cir. 1995), that is not a sufficient reason to hold that the district court abused its discretion by not dismissing the indictment. The panel therefore affirmed the district court's denial of the defendants' motions to dismiss the indictment.

The defendants also sought to dismiss the indictment for violation of Fed. R. Crim. P. 5, which requires that the Government bring defendants before a magistrate judge without unnecessary delay. The panel held that a court has the power to dismiss an indictment for egregious violations of Rule 5, and that the proper inquiry is whether transportation to the United States as a whole was unnecessarily delayed, rather than whether there was some other district in the United States in which the defendant

could have been brought before a magistrate judge more quickly.  The panel held that the district court did not clearly err in its determination that 23 days was not an unreasonable delay, given that the Coast Guard needed to transport the defendants from near the Galapagos Islands to San Diego. The panel therefore concluded that the Coast Guard's decision to take the defendants to California, rather than Florida, did not violate Rule 5.  The panel also held that the district court did not clearly err in finding that the delays between arrival in Long Beach and presentment before a magistrate judge in San Diego were reasonable.  Because the panel held that the Government did not violate Rule 5, it did not need to examine whether the defendants voluntarily signed their Rule 5 waivers, or whether the facts of this case present a Rule 5 violation that warrants dismissal of the indictment.

Cortez-Quinonez argued that even if there was no Rule 5 violation, his statement still should have been suppressed because it was involuntary.  The panel held that the district court did not err by finding that the statement was voluntary under the Due Process Clause, where, at the time he gave his statement, Cortez-Quinonez was no longer experiencing the coercive government misconduct he alleged is the treatment he received on the Coast Guard cutter.

The panel next addressed the defendants' prosecutorial misconduct claims.  The panel held that the prosecutor's use of a "drug trafficker's playbook" analogy during closing argument did not constitute prosecutorial misconduct because the prosecutor's references to a "playbook" were not meant to imply that there was an actual playbook in evidence; instead, the prosecutor used the analogy to explain why the defendants did what they did.  Rejecting the contention that the prosecutor committed misconduct by

arguing in closing that Dominguez-Caicedo was in charge but arguing at sentencing that Cortez-Quinonez was the leader, the panel wrote that the prosecutor did not argue facts that he knew were untrue, and that it was not inconsistent for him to point out all of these facts about Dominguez-Caicedo and Cortez-Quinonez both in closing argument and at sentencing.  For the same reasons, the panel rejected Cortez-Quinonez's argument that the prosecutor's alleged misconduct resulted in depriving him of a minor role reduction, violating his right to due process.  The panel held that the prosecutor's statement that "throwing cocaine overboard on a vessel is knowing possession of cocaine" was harmless error in the context of the entire trial.

In order to corroborate his duress defense, Dominguez-Caicedo attempted to call as an expert witness an attorney who grew up near where Dominguez-Caicedo lived in Colombia, and who would have testified that he is aware that armed criminal paramilitary groups in the area kidnap, intimidate, and use violence to further their criminal enterprises.  Dominguez-Caicedo contended that, in excluding the testimony, the district court's focus on the *Daubert* factors of reliable principles and methods was misplaced, where the subject of the testimony was to be his knowledge and experience, rather than his scientific analyses.  The panel held that, given the extremely broad latitude the Supreme Court has said district courts have in conducting this inquiry, the district court did not abuse its discretion by looking at these particular factors and finding the proposed witness's testimony wanting.

All three defendants challenged the district court's denial of their requests for minor role reductions at sentencing.  The panel clarified how district courts should conduct the minor role analysis.  To be eligible for either a "minimal" role

adjustment, which comes with a guidelines reduction of at least four levels, U.S.S.G. § 3B1.2(a), cmt. 4, or a "minor' role adjustment, which provides a reduction of at least two levels, *id.* at cmt 5, the defendant must be substantially less culpable than the average participant in the criminal activity. The relevant comparison is to the other participants in the defendant's crime, not to typical defendants who commit similar crimes.  To determine whether a defendant is substantially less culpable than the average participant in the offense, a district court must (1) identify all of the individuals for whom there is sufficient evidence of their existence and participation in the overall scheme; (2) calculate a rough average level of culpability for these individuals, taking into consideration the five factors in comment 3(C) to the Mitigating Role Guideline; and (3) compare the defendant's culpability to that average.

The panel agreed with Chichande that the district court's exclusion of his recruiter from the analysis was erroneous because the proper comparison is the average of *all* of the individuals who participated in Chichande's offense, including those that the district court believed were leaders or organizers or who were otherwise highly culpable. Because the district court misunderstood the appropriate legal standard, the panel vacated Chichande's sentence and remanded for the district court to conduct the minor role analysis applying the correct legal standard.  The panel concluded that the Government did not meet its burden of establishing that any error was harmless.

The panel held that the district court did not abuse its discretion in denying Cortez-Quinonez a minor role adjustment.  The panel wrote that the fact that illicit drugs are often traceable to larger drug trafficking organizations does not mean that district courts must compare the conduct

of each defendant convicted of a drug crime to that of every hypothetical member of a drug trafficking organization; the relevant comparators are the *actual* participants in the defendant's crime, and the district court is not required to compare the defendant's culpability with that of the unidentified person.

The panel held that the district court likewise did not err in denying Dominguez-Caicedo a minor role reduction. The panel wrote that the district court did not determine that the "guys with guns" and the "man who commandeered Mr. Dominguez" were "likely participants," and therefore did not err by excluding them from the comparison. Because Dominguez-Caicedo did not properly object to the Presentence Report at all, the district court was not required to address his argument raised for the first time in his sentencing memorandum—and never mentioned during the sentencing hearing—that there was sufficient evidence that the individuals identified were involved in the crime.

**COUNSEL**

Robert H. Rexrode III, Law Offices of Robert Rexrode, San Diego, California, for Defendant-Appellant Segundo Marcial Dominguez-Caicedo.

Michael Marks (argued), Federal Defenders of San Diego Inc., San Diego, California, for Defendant-Appellant Andrian Andres Cortez-Quinonez.

Mark F. Adams, Law Offices of Mark F. Adams, San Diego, California, for Defendant-Appellant Victor Gaspar Chichande.

D. Benjamin Holley (argued), Assistant United States Attorney; Daniel E. Zipp, Chief, Appellate Section, Criminal Division; Robert S. Brewer, Jr., United States Attorney; United States Attorney's Office, San Diego, California; for Plaintiff-Appellee.

**OPINION**

M. SMITH, Circuit Judge:

The defendants in these three consolidated cases—Adrian Andres Cortez-Quinonez, Segundo Marcial Dominguez-Caicedo, and Victor Gaspar Chichande—were convicted of conspiring to distribute cocaine on board a vessel, possession of cocaine with intent to distribute on board a vessel, and aiding and abetting. In this appeal, they challenge the district court's denial of their pre-trial motions to dismiss the indictment. Defendants also argue that the prosecutor committed misconduct in his closing argument. Individually, Dominguez-Caicedo contends that the district court improperly excluded expert testimony that supported his duress defense. Cortez-Quinonez individually appeals the district court's decision not to suppress his post-arrest statements. He also argues that the prosecutor committed misconduct by arguing at his sentencing that Cortez-Quinonez was the ringleader, after arguing at trial that Dominguez-Caicedo was in charge. Finally, all three defendants argue that the district court erred by not granting them minor role reductions at sentencing. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm the defendants' convictions and Dominguez-Caicedo's and Cortez-Quinonez's sentences. We vacate Chichande's sentence and remand for resentencing.

**FACTUAL AND PROCEDURAL BACKGROUND**

On December 31, 2017, the Coast Guard cutter Stratton spotted a suspicious vessel—a 30- to 40-foot "panga" boat—carrying the three defendants near the Galapagos Islands. The Coast Guard observed the vessel and determined that it had no indicia of nationality. From a Coast Guard helicopter, Officer Charles Arena activated the helicopter's

blue law-enforcement lights and broadcast a message to the boat via maritime radio in English and Spanish, informing the vessel that the United States Coast Guard was ordering them to halt.  When the panga did not stop, Arena ordered the "precision marksman" onboard the helicopter to fire warning shots into the water in front of the panga, some of which contained an orange tracer that makes the shots more visible.   After discharging the warning shots, Arena observed "the occupants onboard start to throw items overboard," including "packages that were tied together." The Coast Guard later determined that the packages were attached to a "GPS buoy" that was also thrown overboard. When the panga still did not stop, the marksman fired two more warning shots into the water aft of the panga's engine, apparently to signal that those on board should move away from the engine, and then shot out the engine.  Dominguez-Caicedo testified that by the time he saw the helicopter, it was shooting at the panga.  He did not know that it was a U.S. Coast Guard helicopter.  Cortez-Quinonez stated that he thought the shots from the helicopter were going to kill them.

Three officers from the Coast Guard then boarded the panga.  Dominguez-Caicedo told the officers who boarded the panga that they had been out fishing.  Cortez-Quinonez identified himself as the "master" of the vessel through an interpreter, to one of the Coast Guard officers.   Cortez-Quinonez gave the officers his Ecuadorian identification card.  The other two defendants said that they did not have any identification with them.  The Coast Guard then detained the three defendants and transferred them to the Stratton. Several days later, on January 2, 2018, they were transferred to the Northland, another Coast Guard vessel, where they were detained until January 3.

On board the Stratton, according to Officer Welzant of the Coast Guard, the standard protocol dictates that each detainee is given an initial medical screening by the medical corpsman—essentially a nurse. They are not told where they are headed, they do not get an opportunity to contact their families, and they do not know how long they will be on board. Detainees are chained to a cable that runs the length of the deck inside the helicopter hangar (emptied of helicopters). Each detainee is chained to the cable using an eighteen-inch ankle shackle. The detainees remain chained at all times of the day and night, except for trips to the bathroom and approximately one hour per day of exercise time, during which the detainees are permitted to walk freely on the deck. Detainees can shower periodically. Cortez-Quinonez testified that he was forced to shower with the other two defendants while officers laughed at their "private parts and how [they] were naked," though it was not clear on which cutter this allegedly occurred. Welzant stated that there were no group showers on the Stratton. Welzant testified that detainees are escorted to use the restroom upon request, unless the crew is launching a helicopter or a small boat, which would take approximately ten minutes. However, the Stratton's detainee logbook showed that the three defendants were rarely taken to the restroom between 6:30 p.m. and 7:00 a.m. the next morning. When the three defendants in this case were detained, there were thirty-seven total detainees on board the Stratton.

Welzant testified that Defendants were provided with mats approximately half an inch thick on which to sleep. The Coast Guard confiscated the clothes that the defendants were wearing and gave them disposable Tyvek painters' coveralls to wear instead. These coveralls often ripped and exposed detainees. Each person also routinely receives a blanket. Detainees are fed three meals per day, primarily

consisting of rice and beans, supplemented with fruit approximately every other day.  A jug of water is accessible to detainees at all times.  Welzant stated that the detainees are also provided with dominoes, cards, and Spanish-language Bibles.  Officer Jordan Groff testified to the conditions aboard the Northland, which were substantially similar to those on board the Stratton, except that the detainees ate eggs, potatoes, toast, enchiladas, spaghetti, and chicken, rather than rice and beans.

On January 3, 2018, the defendants were transferred to another Coast Guard cutter, the Mohawk.  The defendants were transferred to the Mohawk—which was heading for Florida—because the Coast Guard suspected that the Department of Justice would prosecute the case in Florida. On the Mohawk, the detainees were kept on the top deck, exposed to the elements.  According to Coast Guard officer Kristopher Meyer, the crew erects a tent on that deck while detainees are on-board to provide some shelter from the elements.  The Mohawk crew does not provide any sleeping mats, though they do give each detainee a blanket and a towel.

While the defendants were on the Mohawk, there were numerous rain squalls, which caused the deck to become wet.  When it rained during the night, the detainees would either have to stand up or try to sleep while laying on the wet deck. On the Mohawk, detainees were served rice and beans for every meal.  The defendants testified that the rice and beans were very undercooked, and that these meals resulted in them suffering gastrointestinal distress.  The Mohawk's detainee log shows that Gaspar Chichande refused five meals in a row, and that Cortez-Quinonez and Dominguez-Caicedo refused three meals in a row.  Cortez-Quinonez

testified that he was denied medical care on board the Mohawk, despite complaining of pain.

The defendants were aboard the Mohawk for five days. On January 8, 2018, they were transferred back to the Stratton—which was heading to California—because the Department of Justice had designated the Southern District of California as the prosecuting district. If the defendants had remained on the Mohawk, they would have arrived in Florida on January 17, 2018. However, the Coast Guard determined that there was no aircraft available to fly the defendants from Florida to California to prosecute them in the designated district.

On January 16, 2018, the defendants were transferred from the Stratton to their final cutter, the Active. The conditions of confinement on the Active were similar to those on the Stratton, except that the area where the defendants were shackled was protected from the elements only by a canvas tarp, and the sleeping mats provided were an inch-and-a-half thick. In addition, the temperature dropped as low as 50 degrees during the time the defendants were onboard the Active. Dominguez-Caicedo testified that he was extremely cold on the Active.

Dominguez-Caicedo and Cortez-Quinonez testified that the shackles and living conditions onboard the cutters caused them significant physical pain. A psychologist, Dr. Julia Kuck, testified as an expert witness at the defendants' motion to dismiss hearing. Dr. Kuck had interviewed Gaspar Chichande and diagnosed him with post-traumatic stress disorder (PTSD) with dissociative symptoms and panic attacks. This diagnosis was based on antecedent traumatic events such as childhood neglect, abandonment, and trauma. Dr. Kuck testified that the "primary triggering event" for Gaspar Chichande's PTSD was the Coast Guard

helicopter firing its gun at the panga.  She also referred to the treatment aboard the Coast Guard cutters as psychological torture due to "unrelenting cold," "wet conditions on deck," "feral treatment of individuals," and "induced desperation."

The Coast Guard had intended to land the Active in San Diego, but due to bad weather, it was prevented from doing so.  Instead, the Active landed in Long Beach on January 22, 2018, where DEA Agent Brandon Pullen met the ship and took custody of the defendants.  Pullen testified that none of the three defendants appeared to be ill or under the influence of drugs or alcohol.  Pullen had each defendant sign a Rule 5 waiver that allowed them to be transferred to San Diego instead of going before a magistrate judge in Long Beach. The waivers also advised Defendants that they were entitled to remain silent and to have an attorney appointed to represent them.

Pullen then advised each defendant of his *Miranda* rights in Spanish through another DEA agent, who served as an interpreter.  Each defendant signed a *Miranda* waiver.  After signing the waiver, Cortez-Quinonez made incriminating statements that suggested he knew that he was transporting drugs.  At a pre-trial hearing, Cortez-Quinonez testified that at the time he signed the *Miranda* form, he did not understand that a lawyer could be appointed for him free of charge; the form does not specify that the appointed attorney would be free of charge.  The statements were nonetheless introduced at trial.  The jury convicted the defendants on all charges.

## STANDARDS OF REVIEW

We review de novo the district court's decision on the motion to dismiss for outrageous government conduct, and we review for abuse of discretion the district court's decision

not to use its supervisory powers to dismiss the indictment. *United States v. Restrepo*, 930 F.2d 705, 712 (9th Cir. 1991). We review "a district court's finding that a pre-arraignment delay was reasonable for clear error." *United States v. Liera*, 585 F.3d 1237, 1242 (9th Cir. 2009) (citation omitted).

In reviewing alleged prosecutorial misconduct to which a defendant objected at trial, we review under the harmless error standard. *United States v. Alcantara-Castillo*, 788 F.3d 1186, 1190 (9th Cir. 2015). Under the harmless error standard, we must view "the challenged conduct in the entire context of the trial, and reverse only if it appears more probable than not that prosecutorial misconduct materially affected the fairness of the trial." *Id.* (citation and internal quotation marks omitted). If the defendant does not contemporaneously object, we review the alleged misconduct for plain error. *Id.* Under plain error, "[w]e may reverse if (1) there was error; (2) it was plain; (3) it affected the defendant's substantial rights; and (4) viewed in the context of the entire trial, the impropriety seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 1190–91 (citation and internal quotation marks omitted). Furthermore, where a defendant alleges multiple instances of misconduct, we must consider the combined prejudicial effect of the misconduct. *Berger v. United States*, 295 U.S. 78, 89 (1935). In considering the cumulative effect of alleged misconduct, where the defendant objected to some—but not all—of the alleged misconduct, we review for plain error. *Alcantara-Castillo*, 788 F.3d at 1191.

## ANALYSIS

### A

Prior to trial, the defendants moved to dismiss the indictment for outrageous government conduct based on their treatment aboard the Coast Guard cutters. They also sought to dismiss the indictment for violation of Federal Rule of Criminal Procedure 5, which requires that the Government bring defendants before a magistrate judge without unnecessary delay.

"The argument that an indictment must be dismissed because of outrageous government conduct is derived from a comment by the Supreme Court in *United States v. Russell*, 411 U.S. 423 (1973)," in which the Court distinguished a claim of outrageous government conduct from a claim of entrapment. *Restrepo*, 930 F.2d at 712. While entrapment depends on the defendant's criminal predisposition, "[a]n indictment may be set aside because of outrageous government conduct whether or not the defendant was predisposed to engage in criminal activity." *Id.* (citation omitted).

"In order to show outrageous government conduct, defendants must show conduct that violates due process in such a way that it is 'so grossly shocking and so outrageous as to violate the universal sense of justice.'" *United States v. Stinson*, 647 F.3d 1196, 1209 (9th Cir. 2011) (quoting *Restrepo*, 930 F.2d at 712). A claim of outrageous government conduct is "a claim that government conduct *in securing an indictment* was so shocking to due process values that the indictment must be dismissed." *United States v. Nickerson*, 731 F.3d 1009, 1015 (9th Cir. 2013) (citation omitted). Therefore, in order to secure dismissal of an indictment due to outrageous government conduct, a

defendant must show a nexus between the conduct and either "securing the indictment or [ ] procuring the conviction." *Id.*

Defendants claim that the nexus between the Government's conduct and securing the indictment is satisfied because "if the Coast Guard had chosen to treat Appellants and other detainees humanely, they simply couldn't have conducted their Pacific operations." Specifically,

> [o]ne officer testified that feeding rice and beans [to the detainees] was the only affordable way for the Coast Guard to accomplish its mission. Another testified that the excessive restraint of defendants resulted from too few watchmen and too many detainees. Coast Guard testified that it couldn't get detainees to shore because its helicopters were old and didn't have long range. They claimed they couldn't wait for diplomatic clearance to get people off the cutters because it would upset the ability to patrol the ocean.

This is not the type of nexus that we generally consider sufficient to establish outrageous government conduct requiring dismissal of an indictment. For example, in *Nickerson*, the defendant argued that her indictment should have been dismissed based on "outrageous government conduct of videotaping her while she was using the toilet in a holding cell at the police station." 731 F.3d at 1014. The video camera that captured the defendant in *Nickerson* served a variety of purposes, including "medical and security concerns, such as if a detainee attempts suicide, if a physical altercation occurs between detainees, or if a detainee

becomes progressively more intoxicated or sick in the holding cell and needs medical attention." *Id.* at 1011. Furthermore, the cameras "deter abusive police conduct[.]" *Id.* We held that "there was no nexus between that conduct and the criminal proceeding at issue." *Id.* at 1015. Accepting Dominguez-Caicedo's logic would have compelled the opposite conclusion. After all, if a medical or security concern resulted in the death of an arrested person, that would preclude the prosecutor from securing an indictment against that person. In other words, nearly all police actions are broadly connected to securing indictments. That cannot mean that all police actions have a nexus within the meaning of the outrageous government conduct doctrine.

We have dismissed an indictment due to outrageous government conduct in a published opinion only once, in *Greene v. United States*, 454 F.2d 783 (9th Cir. 1971). In *Greene*, "the government supplied the equipment and raw material for a bootlegging operation and was the defendant's sole customer." *United States v. Mayer*, 503 F.3d 740, 754 (9th Cir. 2007). We held that the government could not "involve itself so directly and continuously over such a long period of time in the creation and maintenance of criminal operations, and yet prosecute its collaborators." *Greene*, 454 F.2d at 787. The type of nexus in *Greene* between the allegedly outrageous conduct and securing an indictment or conviction is not present in this case.

Indeed, the development of the outrageous government conduct concept suggests that it does not even apply to conditions of pre-trial detention. For that reason, the Eleventh Circuit has rejected claims similar to those Defendants raise here. *See United States v. Jayyousi*, 657 F.3d 1085, 1112 (11th Cir. 2011) (holding that the outrageous government conduct doctrine "does not apply" to

alleged mistreatment between arrest and indictment).  Unlike the Eleventh Circuit, our circuit appears to have assumed without deciding that outrageous government conduct *could* apply to conditions of confinement, so long as there is a nexus between the conduct and securing the indictment or conviction.  *E.g.*, *Nickerson*, 731 F.3d at 1015.  Because there is no nexus here, it is unnecessary to revisit that conclusion.

Separate from the outrageous government conduct claim, federal courts also "have inherent supervisory powers to order dismissal of prosecutions" for three reasons: (1) to remedy "the violation of a recognized statutory or constitutional right"; (2) to ensure "that a conviction rests on appropriate considerations validly before a jury"; and (3) "to deter future illegal conduct."  *United States v. Matta-Ballesteros*, 71 F.3d 754, 763 (9th Cir. 1995) (citation omitted).  Defendants argue that even if outrageous government conduct does not require dismissal of the indictment, the district court should have used its supervisory powers to provide the same remedy.  Their reasoning rests on the assertion that the "government should tread lightly in international waters, and the court should not condone mistreatment of foreigners with no connection to the United States."  Pursuant to *Matta-Ballesteros*, that is not a sufficient reason to hold that the district court abused its discretion by not dismissing the indictment.  Therefore, we affirm the district court's denial of Defendants' motions to dismiss for outrageous government conduct.

## B

Defendants' joint Rule 5 claim requires us to determine (1) whether dismissal of an indictment is a remedy available for violation of Rule 5; and (2) if so, whether Defendants have shown that they are entitled to this remedy.  We hold

that a court has the power to dismiss an indictment for egregious violations of Rule 5, but that the Government did not violate Rule 5 in this case.

**1**

"A person making an arrest outside the United States must take the defendant without unnecessary delay before a magistrate judge[.]"  Fed. R. Crim. P. 5(a)(1)(B).  This is termed the "'presentment' requirement," and it is meant "to prevent secret detention" and "inform a suspect of the charges against him[.]"  *Corley v. United States*, 556 U.S. 303, 306 (2009).  The predecessor to Rule 5(a) was *McNabb v. United States*, 318 U.S. 332 (1943), in which the Supreme Court held that "unwarranted detention" between arrest and presentment "led to tempting utilization of intensive interrogation."  *Mallory v. United States*, 354 U.S. 449, 453 (1957).  "[I]t was deemed necessary to render inadmissible incriminating statements elicited from defendants during a period of unlawful detention."  *Id.*  Thus, the normal remedy for violation of Rule 5 is suppression of statements made during the unnecessary delay.  *Id.*  When an individual does *not* make any incriminating statements during the delay in presentment, we have previously suggested that vacating the conviction and dismissing the indictment is a "drastic remedy" that the court can "invoke."  *United States v. Jernigan*, 582 F.2d 1211, 1214 (9th Cir. 1978).  However, we appear never to have granted that remedy in any prior case.

In *Bayless v. United States*, 381 F.2d 67, 70–71 (9th Cir. 1967), we affirmed the district court's denial of a motion to dismiss based on violation of Rule 5(a).  We held that because the Government did not obtain any incriminating evidence between arrest and presentment, the defendant was not prejudiced by the Government's violation of Rule 5(a).

*Id.* at 71. Consequently, the motion to dismiss the indictment "was correctly denied." *Id.*; *see United States v. Mejia*, 39 F. App'x 568, 569–70 (9th Cir. Apr. 29, 2002) (finding that a thirteen-day delay in presentment, while "reprehensible," did not warrant dismissal of the indictment). Conversely, in *United States v. Osunde*, 638 F. Supp. 171, 176 (N.D. Cal. 1986), the Northern District of California reasoned that a 106-day delay between arrest and presentment was a "flagrant" violation of Rule 5(a). And "[a]lthough the Court [could not] point to case law supporting dismissal, rather than suppression of evidence, for flagrant violations of Rule 5(a)," it held that Osunde's lengthy delay—with no incriminating evidence to suppress—made dismissal of the indictment appropriate. *Id.* at 176–77.

The Second and Eighth Circuits have outright rejected dismissal of the indictment as a remedy for violation of Rule 5, with holdings that appear to foreclose dismissal even in egregious circumstances. *United States v. Peeples*, 962 F.3d 677, 687–88 (2d Cir. 2020); *United States v. Cooke*, 853 F.3d 464, 471 (8th Cir. 2017) (holding that because the purpose of Rule 5 is to deter purposeful delay in presentment in order to extract a confession, "the appropriate remedy for a violation of Rule 5(a)(1)(A) is not dismissal of an indictment, but suppression of evidence illegally obtained as a result of the violation."). However, we are bound by *Bayless* and *Jernigan*, both of which determined that dismissal could be a remedy for particularly egregious violations of Rule 5 where no other relief is available. Thus, we examine whether the Government violated Rule 5. Because we conclude that it did not, we need not reach the question of whether the district court should have dismissed the indictment on that basis.

**2**

Defendants argue that the Government violated Rule 5(a) by (1) having Defendants travel to California instead of Florida; and (2) having Defendants sign Rule 5 waivers that then allowed the Government to interrogate them before presentment, which took place the day after they arrived in the United States.

"Whether or not undue delay occurred . . . must be determined upon the individual facts of each case." *Gray v. United States*, 394 F.2d 96, 100 (9th Cir. 1967). The district court found that "the 23-day delay [between interdiction and arraignment] was reasonable" because "[o]n average, it takes 20 days to transport a detained individual from the Eastern Pacific to the U.S." Further, the district court stated, "the coast guard needed to determine which district in the United States would be responsible for the prosecution of the case and, therefore[,] where the defendants would be transported." According to the district court, the officer in charge of "figuring out how to transport the defendants to this district as quickly as possible" considered several options, including taking the defendants by ship to Florida, with a connecting flight to San Diego. However, because "[e]ach of these options had drawbacks," the officer "determined that transporting via coast guard cutter [to San Diego] was the most expeditious way of transporting [the defendants]." Finally, the district court stated that the timeline of transportation to San Diego and presentment the next morning constituted "bringing the defendants before a magistrate judge without unnecessary delay."

**i**

First, Defendants contend that the district court engaged in the wrong inquiry when examining their transportation to

California.   Instead of asking whether the Government transported Defendants *to the prosecuting district* without unnecessary delay, Defendants claim that the district court should have asked whether the Government transported Defendants *to a magistrate judge* without unnecessary delay.[1]  It is undisputed that Defendants could have arrived in Florida five days earlier than they arrived in California. The issue is whether delay caused by the choice to transport Defendants directly to the prosecuting district (California, in this case) is an "unnecessary" delay for Rule 5 purposes. The district court implicitly held that it was not, and we agree.

Until now, we have not addressed whether a delay in arraignment caused by the Government's choice to send a defendant interdicted on the high seas directly to the prosecuting district (rather than the closest magistrate judge) is "unnecessary delay."   In the Fourth Amendment unreasonable seizure context, the Supreme Court has stated that "[e]xamples of unreasonable delay [in presentment] are delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake." *Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991).   In *McLaughlin*, the Court specifically cited the "often unavoidable delays in transporting arrested persons from one facility to another" as a "practical realit[y]" that would not qualify as unreasonable. *Id.* at 57.

---

[1] Defendants' joint brief incorrectly states that Rule 5(a) requires transportation to "the nearest available magistrate."   This was the language in an outdated version of Rule 5.  The current language does not require that Defendants be transported to the nearest magistrate, only that they are transported to one without unnecessary delay.

Other courts that have addressed delays in presentment of defendants arrested on the high seas have uniformly held that such delays are reasonable. *See, e.g.*, *United States v. Savchenko*, 201 F.R.D. 503, 506 (S.D. Cal. 2001) (holding that sixteen days to transport defendants apprehended 500 nautical miles from Mexico to the Southern District of California was reasonable); *United States v. Barahona-Estupinan*, 2004 WL 7333779, at \*5 (S.D. Cal. Mar. 19. 2004) (six days to transport Defendants from near the Mexico-Guatemala border to San Diego was not unreasonable); *United States v. Torres-Iturre*, 2016 WL 2757283, at \*3–4 (S.D. Cal. May 12, 2016) (twenty-one days to transport Defendants 2439 nautical miles to San Diego was reasonable); *United States v. Aragon*, 2017 WL 2889499, at \*14 (S.D.N.Y. Jul. 5, 2017) (sixteen-day delay caused by transporting Defendants from the Pacific Ocean to New York for prosecution was not unreasonable).

Importantly, none of these cases compare the time it took the Government to bring the defendants to the prosecuting district to the time it *would* have taken to bring the defendants to the *closest* district. The Eleventh Circuit addressed this distinction, writing that "the MDLEA does not prohibit the government from taking offenders to Florida rather than California" because "[a] person violating the MDLEA may be tried in any district, if the offense was begun or committed upon the high seas." *United States v. Cabezas-Montano*, 949 F.3d 567, 591 (11th Cir. 2020) (citation and internal quotation marks omitted). Therefore, the Eleventh Circuit said, "the issue here is not *where* the defendant was taken, but *why* it took the government 49 days to present the defendant arrested outside the United States before a magistrate judge in the United States for a probable cause hearing." *Id.* The court then applied the Eleventh Circuit's test for determining whether a particular delay was

unnecessary. *Id*. at 591–92. Like the Eleventh Circuit, we hold that the proper inquiry is whether transportation to the United States as a whole was unnecessarily delayed, rather than whether there was some other district in the United States in which the defendant could have been brought before a magistrate judge more quickly.

The district court did not clearly err in its determination that twenty-three days was not an unnecessary delay, given that the Coast Guard needed to transport Defendants from near the Galapagos Islands to San Diego. In fact, Defendants do not contend that twenty-three days was an unreasonable amount of time to reach California. We therefore conclude that the Coast Guard's decision to take Defendants to California, rather than Florida, did not violate Rule 5.

**ii**

There was a second period of delay between Defendants arriving in Long Beach and their presentment in San Diego. Defendants argue that this period of delay also violated Rule 5. Although they signed Rule 5 waivers in Long Beach, Defendants say that this was involuntary. Defendants also contend that the waiver only excused the Government from presenting them to a magistrate judge in Long Beach; it did not allow delay of presentment once Defendants arrived in San Diego.

Defendants arrived in Long Beach on January 22 at approximately 11:30 a.m., and cleared customs at 11:50 a.m. Agent Pullen took Defendants to the San Diego DEA office, arriving about 3:00 p.m. (with a stop for food at In-N-Out). That morning or the day before, Pullen had made an appointment for the 5:30 p.m. booking window for the defendants at the prison in San Diego. After *Mirand*izing Defendants, Pullen conducted brief interviews with each (ten

to twenty minutes), and then took them to the prison for booking.  They went before a magistrate judge the next morning, January 23.

We have never addressed whether the standard procedures for booking arrestees in the Southern District of California violate Rule 5.  However, numerous district courts have concluded that they do not.  In *United States v. Lauina*, 2016 WL 1573195, at *1 (S.D. Cal. Apr. 18, 2016), the district court found "it necessary to revisit the current presentment procedures" because "certain detainees are still not presented on either the day of their arrest or the day following their arrest."  The court explained, "In this district, rather than transporting detainees directly to a Magistrate Judge, arresting agents take detainees to the Metropolitan Correctional Center ("MCC") for initial processing." *Id.* This is because "the MCC provides the necessary function of organizing detainees prior to their initial appearance." *Id.* The court wrote that "bringing detainees directly to the Court would likely be disorganized, cause unsafe conditions, and be an inefficient use of the Court's time." *Id.* At the time of *Lauina*, "[t]he MCC maintain[ed] three booking windows each day at approximately 9:00 a.m., 12:30 p.m., and 5:00 p.m." *Id.* at *2.

Following *Lauina*, in *United States v. Portocarrero-Angulo*, 2017 WL 3283856, at *8 (S.D. Cal. Aug. 1, 2017), the district court rejected an international-waters defendant's argument that a Friday-to-Monday delay between arrival in San Diego and presentment was unnecessary.  The court wrote, "General Order No. 605 of this Court requires the Department of Justice, through the Bureau of Prisons and the U.S. Marshal Service, to ensure that every detainee being brought before the Court has been screened for and determined not to have transmittable tuberculosis." *Id.* The

court went on to state that "[t]he need to complete this screening makes the delay between Defendant's arrival in San Diego on Friday afternoon and his presentment the next Monday reasonable." *Id.*

Defendants arrived in Long Beach around 11:50 a.m., so the 5:30 p.m. booking window was the earliest available. Although Cortez-Quinonez states that the Magistrate Judge was arraigning defendants until "at least 5 p.m.," that does not support the contention that Defendants could have been arraigned after their tuberculosis screening at 5:30 p.m. Furthermore, there is no evidence that Pullen purposely delayed the booking and presentment to interrogate the defendants. Under these circumstances, the district court's finding that the delays in presentment were reasonable was not clearly erroneous. Because we hold that the Government did not violate Rule 5, we need not examine whether Defendants voluntarily signed their Rule 5 waivers, or whether the facts of this case present a Rule 5 violation that warrants dismissal of the indictment.

## C

Cortez-Quinonez also argues that in the event we find that there was no Rule 5 violation, his statement still should have been suppressed because it was involuntary.

Upon arrival at the DEA office in San Diego, Cortez-Quinonez and the Spanish-language interpreter had the following exchange in Spanish, which has been translated into English. Per the court translator, "Non-standard spelling, word choice and grammar in English reflect the manner of the Spanish spoken, and have been underlined. Ambiguous utterances have been rendered with different

possibilities (or inferred meaning) in brackets."**2** Additionally, words the agent spoke in English are italicized.

> Agent: *Okay*.  Before <u>doing it</u> any questions, you have to understand your rights.  You have… right to… <u>remeintz</u> silent.  Anything that you say can be <u>useds</u> against you.  <u>Before of</u> a <u>kert</u>.  Before <u>doing it</u> any questions, you have the right to consult an attorney.  You have the right to have an attorney present during the… <u>inter-egation</u>.  In the event of not being able to pay for the services of <u>a</u> attorney, and if you so wish, <u>an [would/were to] be</u>… <u>appointed</u>… before <u>doing it</u> any questions.  Have you understood [<u>his/her/its/</u>your] rights?

> Cortez-Quinonez: Yes.

> Agent: *Okay.*  Are you <u>availab-, wel-</u>, willing to answer somes questions, or do you want an attorney?

> Cortez-Quinonez: Yes, I am willing to… to the questions, because… now, being here—you do understand me?—one, one's family members—you understand me?—things, how they are in [one's] country… when one suffers from hardship…

---

**2** We have reproduced the translation of the transcript exactly as it appears in the record.  The translation appears to be a literal word-for-word substitution of English for Spanish.

Agent: Yes, but, are you sure, or, or… do you want an attorney?

Cortez-Quinonez: [Okay…/What?] There, there isn't, there isn't any money to pay an…

Agent: That's fine. The, uh, here, in this country, they give you an… attorney. You don't have to pay.

[pause]

Agent: *So,* so, do you want to talk, or [does he/does she/do you] want to wait? Until speaking with your attorney.

Cortez-Quinonez: But, the attorney, [until when/for how long]? This morning?

Agent: Yes, but… [that's that/nothing can be done]. You can't… leave. You do understand me?

[pause]

Agent: *So*, do you want to wai' for, for… an attorney?

Cortez-Quinonez: No, well, my buddy doesn't have [enough] for… an attorney neither, just the… the **questions**—you do understand me?

Agent: *Okay, so*, you want to talk?

[pause]

Agent: *Okay.* so put <u>yours</u>… initials here, at each point.   And then, "have you… uh, understood [<u>his/her/its/their/</u>your]  rights?" put "yes."   And then "are you <u>are willid</u> to <u>asnwer somes</u> questions", "yes." *Okay? So,* initials, at each point…

Cortez-Quinonez: [UI] the, of my first name, or—

Agent: —Mm-hmm—

Cortez-Quinonez: —of my last name?

Agent: Yes. Your, uh, first name.

Cortez-Quinonez: My first name.  Like that, like it is here, written down?

Agent: Yes. Mm-hmm.

. . . .

Agent: And then, here, uh… that "yes," you have understood.

[pause]

Agent: And then, here, that "yes," you want to talk.

[pause]

Agent: Initials, at each point.

Cortez-Quinonez: Just of my name?—

Agent: —Yes.

[pause]

Agent: Okay, and the [Ø] goes; put your signature, here.

[pause]

Agent: Thank you.

Cortez-Quinonez then gave an incriminating statement that was used against him at trial.

Pursuant to the Due Process Clause, a statement is voluntary only if it is "the product of a rational intellect and a free will." *Blackburn v. Alabama*, 361 U.S. 199, 208 (1960). "[T]he characteristics of the accused and the details of the interrogation" are relevant considerations. *United States v. Kelley*, 953 F.2d 562, 564–65 (9th Cir. 1992). However, introduction of a statement at trial that was given without "coercive government misconduct" does not violate the Due Process Clause. *Colorado v. Connelly*, 479 U.S. 157, 163 (1986). It appears that the only coercive government misconduct Cortez-Quinonez has alleged is his treatment on board the Coast Guard cutter. However, at the time Cortez-Quinonez gave his statement, he was no longer experiencing this treatment. Cortez-Quinonez was advised of his rights, indicated he understood them, asked a clarifying question about his right to counsel, and then gave an inculpatory statement. The district court did not err by

finding that the statement was voluntary under the Due Process Clause.

## D

## 1

We turn next to Defendants' prosecutorial misconduct claims. In closing argument, the prosecutor stated, "when the coast guard showed up, [Defendants] had to pull from the drug trafficker's playbook. Play number one. You saw it on the video. Don't move. They might not spot you." After defense counsel objected, and the court overruled the objection, the prosecutor clarified, "I'm not talking about a playbook somewhere. I'm talking about what they did and what the facts in evidence show. Okay? Just so we're clear." The prosecutor went on to discuss "Plan B. Act normal. Nothing to see here," "Plan C, speed away," and "Plan D," which "was throw the drugs overboard." After Plan D, "there's more in the playbook," because "Plan E" is to "deceive." Finally, "Plan F" was "[t]hings that they have said" at trial—namely, that they were forced to transport the narcotics. The prosecutor returned to the playbook analogy several times.

Defense counsel objected to the prosecutor's use of the playbook analogy, so we review under the harmless error standard. First, we must determine whether the reference to a playbook was error. *Alcantara-Castillo*, 788 F.3d at 1190. Defendants characterize the prosecutor's alleged misconduct as stating facts that were not in evidence—namely, that there was a drug trafficker's playbook that Defendants were following.

The prosecutor's reference to the playbook analogy is distinct from statements of facts not in evidence that this

court has held to be misconduct requiring reversal. *See, e.g.*, *United States v. Toomey*, 764 F.2d 678, 681 (9th Cir. 1985) (holding that a prosecutor's statement that "[w]e know that the delivery of heroin base . . . occurred on April 28" when there was no evidence that the package contained heroin base was harmless); *United States v. Wilkes*, 662 F.3d 524, 540 (9th Cir. 2011) (holding that a prosecutor's statement that a defense witness lied because he "has an ax to grind" was not improper reference to facts not in evidence).

In this case, the prosecutor's references to a "playbook" clearly were not meant to imply that there was an actual playbook in evidence that listed Plans A–F.[3]  Instead, the prosecutor was using the playbook analogy to provide a framework to consider Defendants' different actions during the Coast Guard's interdiction.

Defendants also argue that the prosecutor's use of the playbook analogy constituted improper vouching and implied extra-record knowledge not available to the jury. The transcript of the prosecutor's closing argument simply does not bear this out.  As stated above, the playbook analogy was used to explain why the defendants did what they did, creating an overarching narrative for the video showing the interdiction.  The prosecutor's argument was based on the facts in evidence.  We hold that this argument did not constitute prosecutorial misconduct, and so we do not address whether the referenced misconduct was harmless error.

---

[3] This contrasts with the case Defendants cite, *United States v. McGill*, 815 F.3d 846 (D.C. Cir. 2016), in which the court held that a prosecutor committed misconduct by arguing that the defendant's letters from jail constituted a "playbook" that the defense attorney and witnesses all consulted in order to put on a false defense.

**2**

Defendants also contend that the prosecutor committed misconduct by arguing in closing that Dominguez-Caicedo was in charge but arguing at sentencing that Cortez-Quinonez was the leader.

In closing, the prosecutor said:

> Here is [Gaspar Chichande's] testimony from this trial. "In fact, you indicated Mr. Cortez was the captain, he was in charge, didn't you?" And he said, "Well, because he had a device with him, and that's why I said he was the captain." "But he had a device, and he would tell you to drive such and such route?" "Yes, sir." "And in fact, you specifically called him the captain?" "Yes, sir." "Because he was in charge?" And he says, "I think so." Right? He thinks he's in charge because he's manning the engines, but you know from watching the video that Mr. Dominguez is the one calling the shots. You see it. He's this one that turns around and gives the order.

The prosecutor also stated "Mr. Dominguez [is] the man giving the order for the boat to take off[.]" In other words, Gaspar Chichande testified that he believed Cortez-Quinonez was the captain of the boat, but the video of the interdiction showed that Dominguez-Caicedo gave the order for the boat to take off.

At Cortez-Quinonez's sentencing, the district court began by giving counsel his tentative on the sentence—240 months. Cortez-Quinonez's attorney "strongly urge[d]"

the court to "come off [its] tentative" based on the argument that Cortez-Quinonez was more similar to Gaspar Chichande (who got 180 months) in terms of relative culpability than he was to Dominguez-Caicedo (who got 216 months). The court stated, "I haven't disregarded your arguments yet, but so far, it kind of has struck me that it's Mr. Cortez that really was the one that was most culpable and most in charge." The prosecutor then argued:

> In terms of the suggestion that [Cortez-Quinonez] wasn't in charge, our trial strategy is not what is necessarily 100 percent what actually is—who's in charge, right?
>
> The fact that we may highlight a particular person in closing argument is a trial strategy in light of how the trial played out and the evidence, but what we do know—so I wouldn't take too much from that.
>
> But what we do know is that Mr. Gaspar Chichande testified, and he said that it was Mr. Cortez who had the GPS communication device. . . . Mr. Cortez says in his post-arrest statement that, in fact, [the bosses] were telling him—giving instructions, that sort of stuff [through the device].
>
> He's also the one who instructs Mr. Gaspar Chichande to activate the GPS device. That's testimony that's uncontroverted in the trial. . . . When the coast guard comes onboard, who is it that says he's the captain? It's Mr. Cortez.

In context, it is clear that the prosecutor did not argue facts in closing that he knew were untrue.  The trial evidence showed both that Dominguez-Caicedo gave the order for the boat to take off, attempting to outrun the Coast Guard, *and* that Cortez-Quinonez was driving the boat, communicating with the bosses back in South America, and gave the order for Gaspar Chichande to activate the GPS buoy before throwing the narcotics overboard.  It was not inconsistent for the prosecutor to point out all of these facts, both in closing argument and at sentencing.  We hold that this alleged misconduct also does not constitute error.

**3**

Cortez-Quinonez argues that the prosecutor's alleged misconduct resulted in depriving him of a minor role reduction, violating his right to due process.  However, for the same reasons that the prosecutorial misconduct claim fails, Cortez-Quinonez's due process claim also fails—the prosecutor highlighted different facts that were not inconsistent with each other at different stages of the proceeding.

**4**

In closing argument, the prosecutor said, "Ladies and gentlemen, throwing cocaine overboard on a vessel is knowing possession of cocaine.  All right?  Just watch this [video] clip.  That's the element in a heartbeat."  Defense counsel objected, and the district court overruled the objection.  The prosecutor then immediately clarified:

> The evidence shows that what they're doing is knowing possession of the cocaine.  They know that it's there, they have control of it, and they're throwing it overboard, and you

> infer from their actions that they know it's cocaine or some other drug . . . and clearly when the coast guard comes, they don't throw the fuel barrels and all that overboard. They're throwing the cocaine overboard.

Defendants argue that although "the prosecutor softened the categorical nature of this incorrect statement of the law," "that softening came too late," resulting in the jury being "most likely left with the incorrect view of the law that simply possessing something that turned out to be cocaine is sufficient to prove knowing possession under the law."

The jury was instructed that "an act is done knowingly if the defendant is aware of the act and does not act through ignorance, mistake, or accident. . . .  You may consider evidence of the defendant's words, acts, or omissions along with all the other evidence in deciding whether the defendant acted knowingly."  Although it is true that throwing wrapped bales overboard without knowing that there is cocaine inside is not in itself enough to establish knowing possession, the prosecutor immediately clarified that he meant the jury could infer knowledge of the contents of the packages based on their throwing them overboard.  This error was harmless in the context of the entire trial.

## E

Dominguez-Caicedo attempted to call an expert witness, Diego Alexander Marinez, an attorney in Colombia. Mr. Marinez grew up approximately 40 miles from the area where Dominguez-Caicedo lived (Barbacoas).  He travels to Barbacoas at least once per month for work.  According to the offer of proof submitted to the district court, Mr. Marinez was prepared to testify that he is familiar with armed criminal paramilitary groups in that area.  He also would

have testified that he "is aware" that these groups kidnap, intimidate, and use violence to further their criminal enterprises, including drug trafficking. Mr. Marinez also stated that he "is aware" that these groups dress in military garb and carry assault rifles in broad daylight in the area.

Mr. Marinez's testimony would have been offered to corroborate Dominguez-Caicedo's duress defense. At trial, Dominguez-Caicedo testified that five paramilitary members carrying machine guns kidnapped him and forced him to transport narcotics. However, the district court excluded Mr. Marinez's expert testimony on the grounds that it was not "based on sufficient facts or data which is the product of reliable principles and methods" and that the witness had not "applied the principles and methods reliably to the facts in the case." The district court continued:

> I can't find what principles and methods the supposed expert would use. I don't even know what he's an expert in. There's no indicia that any other experts would accept the principles or the opinions or conclusions that this so-called expert would proffer. I don't know what his educational background is on the subject. I don't know of any publications or other certifications or professional memberships that he belongs to that would allow him to express an opinion on any of the things that he has proffered. I don't know what materials he may have received or reviewed. I don't know his prior experience as an expert in the area. I don't know what records he may have reviewed, what procedures, and what methodology did he use once in arriving at this so-called

opinion, what examinations, what research, what testing, what surveys, or what verifications were used. I don't know what, if anything, he did to, for example, try to disprove any hypothetical or ultimate conclusion that he has reached. I don't know, in fact, looking at this, any of this, whether he really has any knowledge whatsoever of any of the things that [he] has testified or proposes to testify to.

In all, the district court found "absolutely no indicia whatsoever of reliability," and that the testimony would not be helpful.

Dominguez-Caicedo contends that the district court's focus on the *Daubert* factors of reliable principles and methods was misplaced. Instead, Dominguez-Caicedo argues that the district court's focus should have been on the "knowledge and experience" of the expert, since the subject of the expert's testimony was to be his knowledge and experience, rather than his scientific analyses.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court listed several relevant factors for assessing the reliability of scientific expert testimony under Federal Rule of Evidence 702. Among these were whether the expert's theory or technique has been tested; whether it "has been subjected to peer review and publication"; the "error rate" of "a particular scientific technique"; and the general acceptance of a theory or technique within the scientific community. 509 U.S. at 593–94. Then, in *Kumho Tire*, the Supreme Court discussed how to apply *Daubert* to expert testimony that was not scientific in nature:

> We conclude that *Daubert*'s general holding—setting forth the trial judge's general "gatekeeping" obligation—applies not only to testimony based on "scientific" knowledge, but also to testimony based on "technical" and "other specialized" knowledge. We also conclude that a trial court *may* consider one or more of the more specific factors that *Daubert* mentioned when doing so will help determine that testimony's reliability. But, as the Court stated in *Daubert*, the test of reliability is "flexible," and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather, the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination.

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141–42 (1999) (internal citations omitted).

Although some of the factors the district court listed are not obviously relevant to Mr. Marinez, some are. For example, Mr. Marinez's offer of proof omits *how* Mr. Marinez "is aware" of the activities of FARC. As the district court stated, then, there is no indicia that other experts on FARC would agree with Mr. Marinez's opinion that FARC uses "intimidation and violence in the town of Barabaoas [sic] and its surrounding area to further their criminal enterprises" and that "these armed groups do little to hide their existence in the town of Barbacoas." It was also unclear "what, if anything," Mr. Marinez did to try to disprove his opinion that these individuals are part of FARC.

In short, the offer of proof fell short of showing the basis for Mr. Marinez's expert opinion that Dominguez-Caicedo's testimony about FARC kidnapping him was plausible.

Dominguez-Caicedo is correct in that the factors the district court listed apply more directly to testimony of a scientific nature, which Mr. Marinez's was not. However, given the extremely broad latitude the Supreme Court has said district courts have in conducting this inquiry, we hold the district court did not abuse its discretion by looking at these particular factors and finding Mr. Marinez's testimony wanting. *See Kumho Tire*, 526 U.S. at 142.

**F**

All three defendants challenge the district court's denial of their requests for minor role reductions at sentencing. When reviewing sentencing decisions, we review the district court's identification of the relevant legal standard de novo, its factual findings for clear error, and its application of the legal standard to the facts for abuse of discretion. *United States v. Gasca-Ruiz*, 852 F.3d 1167, 1170 (9th Cir. 2017) (en banc). We begin by clarifying how district courts should conduct the minor role analysis before turning to each defendant's specific arguments.

**1**

A defendant who is "plainly among the least culpable of those involved in the conduct of a group" may receive a "minimal" role adjustment, which comes with a Sentencing Guidelines reduction of at least four levels.[4]      U.S.S.G.

---

[4] We say "at least" because a mitigating role adjustment can interact with other provisions of the Sentencing Guidelines to trigger additional adjustments. *See, e.g.*, U.S.S.G. § 2D1.1(a)(5).

§ 3B1.2(a), cmt. 4.  A defendant "who is less culpable than most other participants in the criminal activity, but whose role could not be described as minimal" may receive a "minor" role adjustment, which provides a reduction of at least two levels.  *Id.* at cmt. 5.  To be eligible for either adjustment, the defendant must also be "substantially less culpable than the average participant in the criminal activity."  *Id.* at cmt. 3(A).

The relevant comparison is to the other participants in the defendant's crime, not to typical defendants who commit similar crimes.[5]  *See United States v. Diaz*, 884 F.3d 911, 916 (9th Cir. 2018).  Thus, in this case, the district court was required to compare the defendants to the other participants in their crimes, not to typical defendants occupying their roles, such as typical drug transporters.  Further, when the mitigating role commentary instructs courts to compare the defendant's culpability to that of "the average participant in the criminal activity," it is not referring to the actual level of culpability of any single participant.  It is instead referring to the mathematical average, *i.e.,* a "single value that represents the midpoint of a broad sample of subjects."  *Average*, *Black's Law Dictionary* (11th ed. 2019).  Thus, "*all* likely participants in the criminal scheme" must be included in calculating the average.  *Diaz*, 884 F.3d at 916–17 (emphasis added); *United States v. Rojas-Millan*, 234 F.3d 464, 472 (9th Cir. 2000).

To determine whether a defendant is substantially less culpable than the average participant in the offense, a district

---

[5] In the past we have referred to these typical defendants as "hypothetical average participants," but we use the term "typical defendant" here because it is more precise, and it avoids confusion with our discussion of the "average participant" referred to in comment 3(A).

court must proceed in three steps. First, the court must identify all of the individuals for whom there is "sufficient evidence of their existence and participation in the overall scheme." *Rojas-Millan*, 234 F.3d at 474. Second, the court must calculate a rough average level of culpability for these individuals, taking into consideration the five factors in comment 3(C) to the Mitigating Role Guideline. *See Diaz*, 884 F.3d at 916. Third, the court must compare the defendant's culpability to that average. If the defendant is substantially less culpable than that average and meets the other criteria, he should be granted a mitigating role adjustment. If the defendant is not substantially less culpable than that average, he is not eligible for the adjustment.

The Government and some district courts appear to have interpreted *United States v. Hurtado*, 760 F.3d 1065, 1069 (9th Cir. 2014), *overruled on other grounds by Gasca-Ruiz*, 852 F.3d at 1174, to suggest that a court must first identify all participants in the crime and then disregard participants of above-average culpability (and, presumably, those of below-average culpability) and compare the defendant's culpability only to the remaining individuals whom the district court deems to be of average culpability. A court following this approach compares the defendant's culpability to only the *median* participants' actual level of culpability instead of comparing the defendant's culpability to the average level of culpability of all the participants in the offense.

This understanding of *Hurtado* is incorrect. At the outset, we note that much of *Hurtado* has been overruled or

abrogated.**[6]** But to the extent anything remains of *Hurtado*, it simply stands for the proposition that comparing a defendant to only the most culpable subset of the participants in the offense does not demonstrate that the defendant is entitled to a minor role reduction. Instead, the district court must compare the defendant's culpability with the average level of culpability of *all* of the participants in the crime. *Hurtado* did not set forth an entirely different method of performing the minor role analysis.

Nor could it have. Fourteen years earlier, we held that courts should compare a defendant's culpability to "all participants in the criminal scheme for which he was charged" even if those co-participants are not charged. *Rojas-Millan*, 234 F.3d at 472. There, the Nevada Highway Patrol stopped Rojas-Millan as he was couriering drugs east from Los Angeles to Nevada. *Id.* at 467–68. In the car with

---

**[6]** For instance, *Hurtado* states that the district court "did not clearly err when it found that Hurtado was a typical commercial drug smuggler—no better, no worse,—and not entitled to a minor role reduction" and that "[t]he district court was not clearly erroneous in finding that although Hurtado may have been a cog in some larger wheel, he was an *essential* cog who . . . knowingly smuggled a large quantity of narcotics into the United States . . . ." 760 F.3d at 1067. But the 2015 amendments to the mitigating role commentary made clear that the relevant comparison is to other participants in the defendant's crime, not to "typical" defendants committing similar crimes, and that "[t]he fact that a defendant performs an essential or indispensable role in the criminal activity is not determinative." U.S.S.G § 3B1.2 cmt. n.3(C). Similarly, *Hurtado* suggested that various factors "alone" could "justify denial of minor role" but we have since held that "the assessment of a defendant's eligibility for a minor-role adjustment must include consideration of the factors identified by the Amendment, not merely the benchmarks established by our caselaw that pre-dates Amendment 794's effective date." *Diaz*, 884 F.3d at 916. We have also since held that *Hurtado* applied the wrong standard of review. *See Gasca-Ruiz*, 852 F.3d at 1174.

him was Jorge Adame-Farias. *Id.* After being convicted of various drug crimes, Rojas-Millan sought a minor role reduction, which the district court denied. *Id.* at 472. The district court concluded that Rojas-Millan was not substantially less culpable than Adame-Farias, who was charged alongside Rojas-Millan, and that it could not compare Rojas-Millan's conduct against the drug supplier in Los Angeles and the recipient in Nevada because they were not charged. *Id.*

We vacated the sentence and remanded, holding that "the district court should have evaluated [Rojas-Millan's] role relative to all participants in the criminal scheme for which he was charged." *Id.* We explained that "ignoring the actions of other participants . . . subjects less culpable defendants to longer sentences simply because their more involved co-conspirators managed to escape arrest or were tried separately. We see no reason why the Guidelines would sanction such a regime, and we find confirmation in the language of § 3B1.2 that the intent was not to do so." *Id.* at 473. We thus vacated Rojas-Millan's sentence and remanded for the district court to compare Rojas-Millan's culpability "relative to the involvement of other likely actors, such as the alleged Los Angeles supplier and the Reno distributor . . . if the district court found sufficient evidence of their existence and participation." *Id.* at 473–74. The only limit on the comparison group we recognized in *Rojas-Millan* was that the district court was required to find "sufficient evidence of [the comparators'] existence and participation" in the crime. *Id.* at 474. If the district court found on remand that the Los Angeles supplier and Reno distributor participated, it was required to compare Rojas-Millan's culpability to theirs. *Id.* at 473–74. We did not hold that the district court could decline to consider the Los Angeles and Reno participants' culpability if it determined

that they were leaders or organizers or were otherwise of "above-average" culpability. Indeed, to do so would be inconsistent with our observation that "ignoring the actions of other participants" undermines the purpose of the minor role reduction because doing so "subjects less culpable defendants to longer sentences simply because their more involved co-conspirators managed to escape arrest or were tried separately." *Id.* at 473.

Since we already held in *Rojas-Millan* that "all participants in the criminal scheme" must be included in the comparison, we could not have departed from that rule in *Hurtado* to require district courts to exclude the most highly culpable participants. *See Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc). Further, while the "median" approach does not turn on who is charged, it is even less consistent with the purposes of the minor role reduction than the approach we disapproved of in *Rojas-Millan* because it would exclude the most culpable participants *in every case*, even if they were charged, simply because they are highly culpable. This approach grossly distorts the court's assessment of the defendant's relative role. Finally, in the eight years since it was decided, we have never cited *Hurtado* in a published opinion for the proposition that district courts may exclude highly culpable participants from the comparison.

In sum, *Hurtado* did not change our longstanding approach to the mitigating role analysis, which requires district courts to include "all participants in the criminal scheme" in the comparison. *Rojas-Millan*, 234 F.3d at 472; *see also Diaz*, 884 F.3d at 916–17. With these clarifications in mind, we turn to each defendant's arguments.

**2**

Chichande argues that the district court erred by excluding his recruiter from the comparison. We agree. The district court concluded that Chichande's recruiter existed and participated, yet it excluded him from the comparison group. The court stated at sentencing:

> So the defendant has to show me well, who's the average participant so that I can then make a determination as to whether or not the defendant is, in fact, substantially less culpable than the average participant . . . . So what do we know? Well, we know this gentleman was recruited by someone who, in my opinion, if that individual were before me, would receive an aggravated role for being a leader/organizer. We have the people with the guns . . . . So taking a look at the people that are involved, there are three people on the boat. I believe, frankly, that probably one of them is somewhat more culpable than the other two. And I do believe that this defendant, given the fact that he was more candid and forthright, probably deserves a break in that regard. It doesn't really affect my assessment of minor role . . . . So what do I know? I know that there were men with guns. I know that there was a recruiter or someone that got this fellow into this venture. But I don't know who the average participant would be. And I don't know that this defendant would be substantially less culpable than whoever that average participant is.

This discussion shows that the district court attempted to identify a single "average participant" with whom to compare Chichande. When the district court could not identify such an individual, it denied the minor role adjustment, apparently without comparing Chichande's culpability with anyone's. At a minimum, the court excluded the recruiter. This analysis was erroneous. As we have explained, the proper comparison is to the average of *all* of the individuals who participated in Chichande's offense, including those that the district court believed were leaders or organizers or who were otherwise highly culpable. Because the district court misunderstood the appropriate legal standard, we vacate Chichande's sentence and remand for the district court to conduct the minor role analysis applying the correct legal standard.

The Government argues that any error in the district court's minor role analysis was harmless because the district court made an alternative Guidelines calculation assuming it granted Chichande a minor role reduction and stated that it would impose the same "sentence regardless of whether [it] gave him minor role." We disagree.

"A mistake in calculating the recommended Guidelines sentencing range is a significant procedural error that requires us to remand for resentencing." *United States v. Munoz-Camarena*, 631 F.3d 1028, 1030 (9th Cir. 2011). "When a defendant is sentenced under an incorrect Guidelines range—whether or not the defendant's ultimate sentence falls within the correct range—the error itself can, and most often will, be sufficient to show a reasonable probability of a different outcome absent the error." *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1345 (2016). Accordingly, we have vacated sentences and remanded for resentencing when district courts have misunderstood the

law governing the minor role reduction. *See, e.g., Diaz*, 884 F.3d at 918; *Rojas-Millan*, 234 F.3d at 475. At the same time, a sentencing error can be harmless. *See Munoz-Camarena*, 631 F.3d at 1030 n.5. To establish harmlessness, the Government must show that "it is more probable than not" that the error did not affect the sentence. *United States v. Morales*, 108 F.3d 1031, 1040 (9th Cir. 1997) (en banc); *see also United States v. Olano*, 507 U.S. 725, 734 (1993).

A "district court's mere statement that it would impose the same . . . sentence no matter what the correct calculation cannot, without more, insulate the sentence from remand." *Munoz-Camarena*, 631 F.3d at 1031; *see also United States v. Williams*, 5 F.4th 973, 978 (9th Cir. 2021). This is because a district court's analysis must "flow from an initial determination of the correct Guidelines range," *id.* at 1031, and the district court must keep that range "in mind throughout the process," *id.* at 1030 (quoting *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008)). At the same time, a sentencing error may be harmless if the district court "acknowledges that the correct Guidelines range is in dispute and performs [its] sentencing analysis twice, beginning with both the correct and incorrect range." *Id.* at 1030 n.5.

The Government argues that that is what the district court did here. We disagree. When it came time to impose the sentence, the district court started by determining that Chichande's criminal history category was I, his base offense level was 38, and a two-level upward adjustment was warranted because he co-piloted the boat, for a total offense level of 40. This yielded a Guidelines range of 292 to 365 months. *See* U.S.S.G. Manual Ch. 5 Pt. A (U.S. Sent'g Comm'n 2018). The district court then concluded that a 292-month sentence "would be excessive" because Chichande was a first-time offender, discussed the 18 U.S.C.

§ 3553(a) factors, and ultimately imposed a sentence of 180 months. After imposing the sentence, the district court provided Chichande with a copy of the supervised release conditions and informed him that he could appeal. Immediately afterward the following exchange occurred:

> **Counsel for Chichande:** Yes, I've told him that I will file that Notice of Appeal this morning.
>
> **The Court:** All right. Is there anything else I need to address? Is there anything – well, I guess for purposes of making sure we all understand – by the way, I did do a guideline calculation assuming that I gave him minor role. I think that would have resulted in, if I'm not mistaken, a range of 121 to 151 months. I think I did a calculation giving him acceptance. That would result in 97 to 121 months.
>
> But as I said, my sentence was based on [the] 3553(a) factors. Given the seriousness of the offense and the nature of the offense, the circumstances of the offense, the amount of the drugs, the fact that a shooting was required, I think 180 months is a reasonable sentence, and I would impose that sentence regardless of whether I gave him minor role. In that case, I would be varying up. In this case, I'm varying down. Anything else I've missed?

The district court's discussion of the alternative ranges at the very end of the sentencing hearing does not

demonstrate that the district court conducted the sentencing a second time starting with the correct range and keeping it in mind throughout the process.  The conclusory nature of this discussion, and the fact that it occurred *after* the district court had already imposed Chichande's sentence and only in response to Chichande's declaration that he would appeal suggest that the district court did not meaningfully consider this range in arriving at its sentence.  Since the Government has not met its burden of establishing that any error was harmless, we vacate Chichande's sentence and remand for resentencing so that the district court may apply the correct legal standard.

### 3

Cortez-Quinonez argues that the district court erred because it "expressly acknowledged the existence of a Pablo-Escobar-type drug lord" and "a giant, complex drug-trafficking organization" but nevertheless refused to include members of that organization in the comparison.  In the district court, Cortez-Quinonez cited a report that the Sentencing Commission sent to Congress listing roles of individuals often involved in drug trafficking organizations in order of their typical culpability and argued that the court was required to compare his conduct to individuals occupying those roles who "likely" were involved in his crime.

The fact that illicit drugs are often traceable to larger drug trafficking organizations does not mean that district courts must compare the conduct of each defendant convicted of a drug crime to that of every hypothetical member of a typical drug trafficking organization.  *See United States v. Rosas*, 615 F.3d 1058, 1068 (9th Cir. 2010) ("Every drug trafficking defendant could point to an unknown network preceding them in the drug trade. Such an

argument will normally be ineffective when considering whether the defendant is entitled to a mitigating role reduction.").   We have repeatedly held that the relevant comparators are the *actual* participants in the defendant's crime.  *See, e.g., Diaz*, 884 F.3d at 916–18; *United States v. Benitez*, 34 F.3d 1489, 1498 (9th Cir. 1994); *United States v. Petti*, 973 F.2d 1441, 1447 (9th Cir. 1992).   The 2015 Amendments to the mitigating role commentary confirmed that interpretation.  *See United States v. Quintero-Leyva*, 823 F.3d 519, 522–23 (9th Cir. 2016).   By "actual participants," we mean only participants for whom there is "sufficient evidence of their existence and participation." *Rojas-Millan*, 234 F.3d at 474.   Even if one can *assume* based on how drug trafficking organizations typically operate that it is likely that another unidentified person participated in the crime, the district court is not required to compare the defendant's culpability with that of the unidentified person.   Indeed, without evidence of the proposed comparator's existence or participation the district court has nothing against which to compare the defendant's conduct.  In this case, for example, Cortez-Quinonez invited the district court to speculate about what roles hypothetical participants in drug trafficking organizations typically occupy and to compare those hypothetical participants' imagined conduct to his own.  We have repeatedly rejected these kinds of comparisons in the past, and we do so again today.  *See Diaz*, 884 F.3d at 913–18 (holding that district court properly limited the comparison group to Diaz's recruiter and co-participant and properly declined to compare Diaz's culpability to that of "'unknown' individuals who 'have to exist in order for a  drug trafficking organization to function'"); *Rosas*, 615 F.3d at 1068 (holding that district court properly limited the comparison group to Rosas'  two co-participants and properly declined to compare him to "unknown participants in the drug chain,

including 'the source of the marijuana, distributors, packagers, sellers, etc.'").

In arguing to the contrary, Cortez-Quinonez relies heavily on our statements in *Diaz* and *Rojas-Millan* instructing district courts to consider "likely" participants. But Cortez-Quinonez takes the word "likely" out of context. We have referred to likely participants to make clear that the defendant does not necessarily need to know the participant's name or see the participant for there to be sufficient evidence of that person's participation in the offense. *See Diaz*, 884 F.3d at 917; *Rojas-Millan*, 234 F.3d at 473–74. But we have never required a comparison to unknown persons one might *assume* participated but about whom there is no evidence of their *actual* participation. Therefore, the district court did not err by declining to compare Cortez-Quinonez's culpability to the unknown "Pablo-Escobar-type drug lord" and unknown members of "a giant, complex drug-trafficking organization" that may have been involved in the manufacture and distribution of the drugs Cortez-Quinonez was transporting.

Cortez-Quinonez next argues that the district court erred by "ignor[ing] [his] lack of ownership in the drugs and his relatively low compensation." But the district court heard argument regarding this factor, stated that it considered all "five nonexhaustive factors," and ultimately adopted the Government's analysis of them. And even if the district court erroneously weighed that factor against Cortez-Quinonez, that one of the five factors in comment 3(C) weighed in favor of Cortez-Quinonez does not mean that the district court abused its discretion in denying the minor role adjustment. *See Quintero-Leyva*, 823 F.3d at 523.

**4**

Dominguez-Caicedo's arguments are similar.  He claims that the district court identified "the man who commandeered Mr. Dominguez into participating in this offense" and "the 'guys with the guns' who approached Dominguez" as "potential likely participants" but nevertheless improperly refused to compare his culpability to theirs.  He also argues that the district court improperly "overlooked" "all the persons" the Government identified in its pre-trial expert disclosure, "those who actually own the cocaine at the heart of this case," and "those who recruited and tricked Mr. Dominguez's co-defendants."  Once again, we disagree.

With respect to the "guys with guns" and "man who commandeered Mr. Dominguez into participating in this offense" Dominguez-Caicedo's characterization is not consistent with the record.  Dominguez-Caicedo testified at trial that while he was harvesting bananas in rural Colombia, he was kidnapped by five armed men wearing hoodies and masks who told him they needed him for a mission.  He testified that these men eventually placed him on the boat carrying the drugs at issue here.  At sentencing, the district court made clear that it did not believe Dominguez-Caicedo's account and did not find these individuals to be likely participants in the offense.  The court explained: "I mean, Mr. Dominguez-Caicedo was hoping that by telling his story, he was going to [be] able to convince the jury that he was acting under duress.  The jury didn't believe it.  It's a self-serving statement that I frankly – I don't buy, either.  I don't accept it."  Therefore, contrary to Dominguez-Caicedo's argument, the district court did not determine that the "guys with guns" and the "man who commandeered

Mr. Dominguez" were "likely participants," and therefore did not err by excluding them from the comparison.

Next, the district court was not required to address the people the Government identified in its pre-trial expert disclosure, the people who allegedly owned the cocaine, and the people who allegedly recruited Dominguez-Caicedo's co-defendants because Dominguez-Caicedo failed to object to the Presentence Report's (PSR) conclusion that he did not provide evidence of their existence and participation in the offense.

The PSR concludes that "the defendant has presented no information supporting the fact that he was substantially less culpable than the other identified participants in this offense as he appears to have held the same role as CORTEZ and GASPAR." It also says that "Defense counsel . . . believes a minor role adjustment is appropriate, but did not provide any basis for it." Federal Rule of Criminal Procedure 32(f)(1) requires parties to "state in writing any objections, including objections to material information . . . contained in or omitted from the [PSR]." If a party objects to a material factual assertion in or omission from the PSR, the district court must rule on the objection. Fed. R. Crim. P. 32(i)(3)(B); *see also United States v. Petri*, 731 F.3d 833, 837–39 (9th Cir. 2013). But if a party does not object, the district court is not required to address factual assertions raised for the first time in a sentencing memorandum or at the sentencing hearing. *Petri,* 731 F.3d at 841.

*Petri* is illustrative. There, Petri objected to the PSR's recommendation that the district court deny Petri's request for a minor role reduction because, among other things, he alleged that he was "used by the more sophisticated individuals in the scheme, including a man named 'Sorin,' whom Petri identified as the ringleader." *Id.* at 836. But

while Petri cited Sorin's alleged involvement in support of his objection to the PSR's recommendation to deny him a minor role reduction, he did not specifically object to the omission of factual information about Sorin in the PSR. *Id.* at 836, 841. In other words, Petri objected to the probation officer's ultimate recommendation that the court deny the minor role reduction but did not specifically object to the probation officer's decision not to include "any factual assertion regarding whether 'Sorin' manipulated or coerced Petri into complicity." *Id.* at 841. In his sentencing memorandum and during the sentencing hearing, Petri's attorney attempted to supplement the record with details about Sorin's alleged coercion and argued that recently discovered documents showed Sorin was involved. *Id.* at 836–37. The district court ultimately denied the minor role reduction without addressing whether Sorin coerced Petri. *Id.* at 837. On appeal, we held that the district court "had no responsibility to rule on . . . if 'Sorin' coerced" Petri because Petri's objection to the PSR was not specifically directed at the alleged factual omissions in the PSR. *Id.* at 841.

Dominguez-Caicedo did not properly object to his presentence report at all.[7] Therefore, the district court was

---

[7] Dominguez-Caicedo included a footnote in his sentencing memorandum citing to Cortez-Quinonez's objections to *his* PSR and stated that "Mr. Dominguez joins in his co-defendant's analysis regarding the applicability of a mitigating role adjustment in this case." Dominguez-Caicedo's footnote is not a proper objection to the PSR. First, it does not dispute any of the factual assertions or alleged omissions in his own PSR. Second, we held in *Petri* that an argument in a sentencing memorandum does not constitute an objection to a PSR. Third, Dominguez-Caicedo filed his sentencing memorandum after the deadline for objecting to the PSR. The deadline for objecting to the PSR is "14 days after receiving" it, Fed. R. Crim. P. 32(f)(1), and Dominguez-

not required to address his argument raised for the first time in his sentencing memorandum—and never mentioned during the sentencing hearing—that there was sufficient evidence that the individuals he identified were involved in the crime.

## CONCLUSION

We affirm all three defendants' convictions, and Dominguez-Caicedo's and Cortez-Quinonez's sentences. We vacate Chichande's sentence and remand for resentencing consistent with this opinion.

**AFFIRMED in part, and VACATED and REMANDED in part.**

---

Caicedo filed his sentencing memorandum 28 days after the PSR was filed. For each of these reasons, Dominguez-Caicedo's footnote was not a proper objection to the PSR, and it did not require the district court to address whether these individuals participated in the crime.